**STATE OF LOUISIANA * PARISH OF OUACHITA * 4TH JUDICIAL DISTRICT**

MAR 2 3 2018

LUV N' CARE, LTD.                          FILED: _____

VS. NO.: _____
~~18-1040~~
                                           DANA BENSON
JACKEL INTERNATIONAL LIMITED,    BY: _____
MAYBORN USA, INC., JACKEL CHINA       **DEPUTY CLERK OF COURT**
LIMITED,   MAYBORN   ANZ   PTY.
LIMITED, PRODUCT MARKETING
MAYBORN LIMITED AND MAYBORN
GROUP LIMITED

<u>**PETITION**</u>

**NOW INTO COURT**, through undersigned Counsel, comes LUV N' CARE, LTD., a

Louisiana Corporation, organized and existing under the laws of the State of Louisiana,

(hereinafter referred to as "LNC" or "Plaintiff"), who respectfully represents, as follows, to-wit:

1.

Made Defendants herein are:

1.1.   JACKEL INTERNATIONAL LIMITED (hereinafter "Jackel"), a corporation

organized and existing under the laws of the United Kingdom, having a principal

office and place of business at Dudley Lane, West Cramlington, Northumberland,

NE23 7RH;

1.2.   MAYBORN USA, INC., a corporation organized and existing under the laws of

the State of New York, having a principal office and place of business at 1

Edgewater Drive, Suite 109, Norwood, MA 02062;

1.3.   JACKEL CHINA LIMITED, having a principal place of business at 143 Hoi

Bun Road, 14/F., China Aerospace Centre, Kwun Tong, Kowloon, Hong Kong.

1.4.   MAYBORN ANZ PTY. LIMITED, having a principal place of business at U 21

15 Ricketts Road, Mount Waverly, Victoria 3149, Australia;

1.5.   PRODUCT MARKETING MAYBORN LIMITED, 14/F., China Aerospace

Centre, Kwun Tong, Kowloon, Hong Kong; and

1.6.   MAYBORN GROUP LIMITED, having a principal place of business at Dudley

Lane, West Cramlington, Northumberland, NE23 7RH, United Kingdom

(hereinafter collectively referred to as "JACKEL").

2.

Plaintiff shows that it and Jackel are competitors in the field of child and baby products.

3.

Following a February 7, 2013 jury verdict in a suit entitled and styled, *Luv n' care, Ltd. v. Jackel International Limited*, No. 10-1891, in the State of Louisiana, Parish of Ouachita, Fourth Judicial District Court, the Court entered the Judgment by the jury hearing the case on May 21, 2013 ("2013 Judgment"), a true and correct copy of which is attached as Exhibit "1," holding that JACKEL was found to constitute a single business enterprise that included Jackel, Mayborn Group Limited, Product Marketing Mayborn Limited, Mayborn USA, Inc., Jackel China Limited, and Mayborn ANZ Pty. Limited.

4.

Plaintiff shows that it entered into a Distribution Agreement with Defendant Jackel, which had an effective date of April 17, 2003 (hereinafter referred to as "the 2003 Agreement"), a true and correct copy of which is attached hereto as Exhibit "2."

5.

Plaintiff shows that on April 17, 2008, it entered into another Distribution Agreement with Jackel, (hereinafter referred to as the "2008 Agreement"), a true and correct copy of which is attached hereto as Exhibit "3," which followed in succession to the 2003 Agreement; moreover, the 2008 Agreement continued an ongoing business relationship between the parties, commenced with the 2003 Agreement, until the 2008 Agreement was terminated.

6.

Plaintiff shows that under the 2008 Agreement, Jackel was to serve as the exclusive distributors of LNC products bearing such LNC trademark(s) as "Luv n' care," "LNC," "Nuby" and/or "Natural Touch" in the United Kingdom, Ireland and Gibraltar, which products included for example, bottles (including silicone, polypropylene and polycarbonate bottles), teats and nipples; soothers and pacifiers; cups and tableware, including spill proof weaning cups (including straws); teethers, bibs; breast pumps and sterilizers; bottle warmers; and infant care baby accessories, namely, nipple/teat brushes, bottle brushes, pacifier/soother holders and cases, bottle bags, milk powder dispensers, and storage cases and containers.

7.

Plaintiff shows that under the terms of the 2008 Agreement, Jackel expressly acknowledged and agreed "not to copy or utilize any of LNC's formulae, trade secrets, product design, patents, drawings, business plans, prototypes, packaging, procedures and methods, any

other proprietary designs or information without LNC's written permission." *See* Exhibit "3," ¶
3.

8.

Plaintiff shows that the 2008 Agreement further provided that, during the term of the said
Agreement and thereafter following the expiration and/or termination of the Agreement, Jackel
would not disclose or make accessible to anyone, or make use of the knowledge or information
which it had obtained during the term of the Agreement, with respect to product design, features
of LNC products, functions of said products, drawings, prototypes, procedures and methods, and
any other information of LNC without the written consent of LNC.

9.

Plaintiff shows that the 2008 Agreement further provided that, upon expiration and/or
termination of said Agreement, all rights granted to Jackel during the term of the Agreement to the
use of LNC trademarks, trade names, drawing and designs of LNC and brand names immediately
ceased and terminated and that Jackel shall have no further rights thereto and shall make no claims
to use thereto.

10.

Plaintiff shows that, by the terms of the 2008 Agreement, Jackel acknowledged that LNC
has exclusive rights in the relevant Territory to the use of LNC's trademarks, trade names and
brand names and would not challenge the validity or ownership of LNC's trademarks, trade names
and brand names during the terms of the 2008 Agreement or thereafter.

11.

Plaintiff further alleges that, in addition, Jackel agreed in the 2008 Agreement not to use,
in any fashion, Plaintiff's products, formulae, trade secrets, product designs, patents, drawings,
prototypes, procedures, packaging, business plans and methods, any other features or functions of
LNC products, and/or designs or information of LNC, or any colorable imitation thereof, and that
any use of the above without LNC's written consent would be a violation of the 2008 Agreement.

12.

Plaintiff shows that under the terms of the 2008 Agreement, LNC and Jackel agreed that
the validity and interpretation of the 2008 Agreement would be governed by and construed in
accordance with the laws of the State of Louisiana, and that any controversy or claim arising out
of or relating to the 2008 Agreement, or the breach thereof, would be adjudicated and settled in

the 4ᵗʰ Judicial District Court for the Parish of Ouachita, Louisiana; moreover, Plaintiff further shows that the forum provision in the 2008 Agreement was a key part of the negotiations leading up to the execution of the 2008 Agreement.

13.

Plaintiff shows that under the 2008 Agreement, Jackel distributed the identified child and baby products of LNC in Great Britain, Ireland, and Gibraltar, as contemplated under the Agreement, and that said products included but are not limited to LNC cup products including straw cup products.

14.

Plaintiff further shows that in the prior suit against JACKEL, a Jury found that the 2008 Agreement was valid and enforceable, and JACKEL was bound by the terms and obligations of the 2008 Agreement with the result that Plaintiff alleges that JACKEL is bound by the prior determination in said suit by *Res Judicata* and/or "the law of the case" as relates to the validity and enforceability of the 2008 Agreement in question in the instant lawsuit, and may not otherwise challenge the interpretation, validity and enforceability of the 2008 Agreement in this action.

15.

Plaintiff further shows that the exact same provisions found in paragraphs 15 and 19 of the 2008 Agreement were interpreted as a matter of law by the United States Court of Appeals for the Fifth Circuit in *Luv n' care, Ltd. v. Groupo Rimar*, 844 F.3d 442 (5ᵗʰ Cir. 2016). The Fifth Circuit interpreted the prohibition in the 2008 Agreement against copying any of LNC's designs and products to mean what it says. There is no requirement that any of the information covered by the 2008 Agreement be separately protected by intellectual property rights. Moreover, the applicable provisions of the 2008 Agreement preclude the use or copying of products, designs and/or other information that may have otherwise been in the public domain before entry into a Distributor Agreement with LNC.

16.

Plaintiff further shows that, since the adjudication in the first aforesaid suit against Jackel, it has become aware that JACKEL is now advertising, promoting, commercializing, and selling new products, including but not limited to additional new cup products and straw cup products (hereinafter referred to as "the Accused Products") that were **not** at issue in said first suit, nor were said products on the market at the time the aforesaid first suit was filed by Plaintiff; therefore,

Plaintiff shows that these "new" products of JACKAL constitute a subsequent breach of Defendants' obligations under the 2008 Agreement.

17.

Attached as Exhibit "4" is a true and correct photograph of the front and back of a Tommee Tippee (JACKEL) package of two insulated straw tumblers for a 12m⁺ old child. Attached as Exhibit "5" is a true and correct photograph of two aspects of the pink Tommee Tippee insulated straw tumbler taken from the package depicted in Exhibit "4." Attached as Exhibit "6" is a true and correct photograph of several aspects of the underside of the lid portion of the pink Tommee Tippee insulated straw tumbler depicted in Exhibit "5."

18.

Exhibit "6" shows the configuration of the straw portion as installed in the lid of the Tommee Tippee insulated straw tumbler. This includes a separate lower straw portion inserted into what is referenced by Jackel in the accompanying product information sheet as a silicone valve and straw. Exhibit "7" is a true and correct photograph of the entire silicone valve and straw portion and the lower straw portion of the Tommee Tippee insulated straw tumbler removed from the insulated tumbler. Exhibit "7" also includes a true and correct photograph of the straw portion of the Tommee Tippee insulated straw tumbler disassembled into its two component parts. The upper portion of the straw consists of a unitary silicone valve and straw for insertion into the lid of the Tommee Tippee insulated straw tumbler. The lower straw portion attaches to the silicone valve and straw portion and descends into the container body of the Tommee Tippee insulated straw tumbler.

19.

The entire straw portion of the Tommee Tippee insulated straw tumbler including the unitary silicone valve and straw including its incorporation and use in a tumbler product is an impermissible use and copy of LNC's design, features and products in breach of the 2008 Agreement. In the development of the Tommee Tippee insulated straw tumbler 12m⁺, Jackel has impermissibly made use of knowledge and information gained from LNC in connection with LNC's product designs, features and methods obtained under the terms of the 2008 Agreement. The Tommee Tippee insulated straw tumbler 12m⁺, as depicted in Exhibits "4," "5," "6" and "7" represents an example of an Accused Product presently being commercialized, advertised, promoted, offered for sale and sold by Jackel in breach of the 2008 Agreement.

20.

Attached as Exhibit "8" is a true and correct photograph of the front and back of a Tommee Tippee (JACKEL) package of two trainer straw cups for a 7m⁺ old child.  Attached as Exhibit "9" is a true and correct photograph of various aspects of the pink Tommee Tippee trainer straw cup taken from the package depicted in Exhibit "8."   Attached as Exhibit "10" is a true and correct photograph of several aspects of the underside of the lid portion of the pink Tommee Tippee trainer straw cup depicted in Exhibit "9."

21.

Exhibit "10" shows the configuration of the straw portion as installed in the lid of the Tommee Tippee trainer straw cup.  This includes a separate lower straw portion inserted into what is referenced by Jackel in the accompanying product information sheet as a silicone valve and straw.  Exhibit "11" is a true and correct photograph of the entire silicone valve and straw portion and lower straw portion of the Tommee Tippee trainer straw cup removed from the trainer cup. Exhibit "11" also includes a true and correct photograph of the straw portion of the Tommee Tippee trainer straw cup disassembled into its two component parts.  The upper portion of the straw consists of a unitary silicone valve and straw for insertion into the lid of the Tommee Tippee trainer straw cup.  The lower straw portion attaches to the silicone valve and straw portion and descends into the container body of the Tommee Tippee trainer straw cup.

22.

The entire straw portion of the Tommee Tippee trainer straw cup including the unitary silicone valve and straw as well as its incorporation and use in a cup product is an impermissible copy of LNC's design, features and products in breach of the 2008 Agreement.  In the development of the Tommee Tippee trainer straw cup, Jackel has impermissibly made use of knowledge and information gained from LNC in connection with LNC's product designs, features and methods obtained under the terms of the 2008 Agreement.  The Tommee Tippee trainer straw tumbler 12m⁺, as depicted in Exhibits "8," "9," "10" and "11" represents another example of an Accused Product presently being commercialized, advertised, promoted, offered for sale and sold by Jackel in breach of the 2008 Agreement.

23.

Attached as Exhibit "12" is a true and correct photograph of a side by side placement of the respective straw portions taken from the Tommee Tippee insulated straw tumbler 12m⁺

6

(Exhibit "5") and the Tommee Tippee trainer straw cup (Exhibit "9"). Except for the length of the lower straw portion, the straws are identical including the unitary silicone valve and straw component.

24.

Attached as Exhibit "13" is a true and correct photograph of the front of a Tommee Tippee (JACKEL) Tuff Stuff Straw Tumbler for a 18m$^+$ old child. Attached as Exhibit "14" is a true and correct photograph of three aspects of the Tommee Tippee Tuff Stuff Straw Tumbler taken from the package depicted in Exhibit "13." Attached as Exhibit "15" is a true and correct photograph of several aspects of the Tommee Tippee Tuff Stuff Straw Tumbler with the sliding helmet cover on the lid opened to expose the straw. Attached as Exhibit "16" is a true and correct photograph of several aspects of the underside of the lid portion of the Tommee Tippee Tuff Stuff Straw Tumbler depicted in Exhibit "14."

25.

Exhibit "16" shows the configuration of the straw portion as installed in the lid of the Tommee Tippee Tuff Stuff Straw Tumbler. This includes a separate lower straw portion inserted into what is referenced by Jackel in the accompanying product information sheet as a silicone valve and straw. Exhibit "17" is a true and correct photograph if the entire silicone valve and straw portion and the lower straw portion of the Tommee Tippee Tuff Stuff Straw Tumbler removed from the tumbler. Exhibit "17" also includes a true and correct photograph of the straw portion of the Tommee Tippee Tuff Stuff Straw Tumbler disassembled into its two component parts. The upper portion of the straw consists of a unitary silicone valve and straw for insertion into the lid of the Tommee Tippee Tuff Stuff Straw Tumbler. The lower straw portion attaches to the silicone valve and descends into the container body of the Tommee Tippee Tuff Stuff Straw Tumbler.

26.

The entire straw portion of the Tommee Tippee Tuff Stuff Straw Tumbler including the unitary silicone valve and straw including its incorporation and use in a tumbler product is an impermissible use and copy of LNC's design, features and products in breach of the 2008 Agreement. In addition, the use of a sliding cover or "helmet" on the top portion of the lid of the Tommee Tippee Tuff Stuff Straw Tumbler for covering and uncovering the upper straw portion is also an impermissible use and copy of LNC's design, features and products found, for example, in LNC's extensive line of "Flip-It" cup products. In the development of the Tommee Tippee Tuff

7

Stuff Straw Tumbler 18m$^+$, Jackel has impermissibly used knowledge and information gained from LNC in connection with LNC's product designs, features and methods obtained under the terms of the 2008 Agreement. The Tommee Tippee Tuff Stuff Straw Tumbler 18m$^+$, as depicted in Exhibits "13," "14," "15," "16" and "17," represent a further example of an Accused Product presently being commercialized, advertised, promoted, offered for sale and sold by Jackel in breach of the 2008 Agreement.

27.

Upon information and belief, LNC's product designs, features, methods, business plans and other information and knowledge gained from LNC under the 2008 Agreement for a straw incorporated into a child's drinking product as well as the use of a sliding cover or "helmet" on the top portion of a lid for covering and uncovering the upper straw portion has been further impermissibly incorporated by Jackel into other Tommee Tippee straw cups, tumblers and other children's drinking products including, but not limited to, insulated straw tumblers for various age groups, straw cups for various age groups and stainless steel straw cups for various age groups. Any Tommee Tippee children's drinking product incorporating LNC's straw design and other features, as discussed and exemplified in connection with Exhibits "7" through "17" herein, would represent additional Accused Product sold in breach of the 2008 Agreement.

28.

Attached as Exhibit "18" is a true and correct photograph of the front and back of a Tommee Tippee (JACKEL) package for a first sips soft transitions cup for 4m$^+$. The cup package includes a single cup body and two separate soft silicone tops – a silicone nipple top and a silicone spout top. Attached as Exhibit "19" is a true and correct photograph of two aspects of the first sips soft transitions cup fitted with the soft silicone nipple top taken from the package depicted in Exhibit "18." Attached as Exhibit "20" is a true and correct photograph of two aspects of the first sips soft transitions cup fitted with the soft silicone spout top. Attached as Exhibit "21" is a true and correct photograph of the lid portion of the first sips soft transitions cup together with both the silicone nipple top and the silicone spout top.

29.

The Tommee Tippee (JACKEL) first sips transition cup is an impermissible use of LNC's product designs, features and methods including, but not limited to, the use of silicone and compression for children's drinking cup lids in breach of the 2008 Agreement. In addition, the

8

development, design, manufacture, sale and marketing of cup products with multiple tops for transitions between nipples and spouts as a child grows while using the same cup body represents the impermissible exploitation of knowledge, information, business plans and methods learned from LNC under the 2008 Agreement. The Tommee Tippee first sips soft transition cup $4m^+$, as depicted in Exhibits "18," "19," "20" and "21" represents yet another example of an "Accused Product" presently being commercialized, advertised, promoted, offered for sale and sold by Jackel in breach of the 2008 Agreement.

30.

Upon information and belief, LNC's product designs, features, methods, business plans and other information and knowledge gained from LNC under the 2008 Agreement have been further incorporated by Jackel into other Tommee Tippee children's drinking cup products including the commercialization, promotion, advertising and sale of other cup products with multiple silicone lids for use as an infant transitions from one stage of development to the next. These additional products would also represent an example of additional Accused Products sold in breach of the 2008 Agreement.

31.

Plaintiff shows that JACKEL's commercialization, promotion, advertising, offer for sale and sale of the Accused Products violates the 2008 Agreement and is a breach of the obligations of said Agreement by Jackel.

32.

Plaintiff shows that JACKEL acted in concert to breach the 2008 Agreement.

33.

Plaintiff shows that JACKEL breached their obligations under the 2008 Agreement in the commercialization, promotion, advertising, offer for sale and sale of the Accused Products which has caused LNC to suffer damages as a result of JACKEL's breach.

34.

In addition, Plaintiff shows that it also urges a claim against JACKEL under the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La. R.S. 51:1401 *et seq.* and desires and is entitled to an award of damages against JACKEL commiserate with JACKEL's actions and behavior therewith.

35.

Plaintiff shows that JACKEL's activities, as described hereinabove, were and are willful and designed to take unfair advantage of Defendants' prior business relationship with LNC under the terms of the 2008 Agreement.

36.

Plaintiff shows that JACKEL's activities constitute unfair methods of competition and unfair and/or deceptive acts of practice in the conduct of any trade or commerce and because of same, Plaintiff desires and is entitled to collect damages from JACKAL in connection therewith.

37.

Plaintiff shows that JACKEL's acts of unfair competition were and are willful and that they have profited from their activities.

38.

Plaintiff shows that JACKEL acted in concert to commit willful, unfair and/or deceptive trade practices to unfairly profit by breaching the 2008 Agreement in the conduct of trade and/or commerce.

39.

Plaintiff shows that JACKEL continues its willful and intentional disregard of the terms of the 2008 Agreement with Plaintiff and that it has and will continue to suffer substantial damages as a result of JACKEL's bad faith activities and conspiring conduct with respect to JACKEL's breach of contract and acts of unfair competition; therefore Plaintiff desires judgment against JACKEL in an amount commensurate with all of its losses alleged herein plus reasonable attorney's fees, with legal interest thereon from the date of judicial demand until paid, and for all costs of these proceedings as well as for any and all other remedies permitted by law.

40.

Plaintiff further shows that it desires as part of any Judgment rendered by this Honorable Court, after trial of this matter, an Order prohibiting and permanently enjoining JACKEL from selling any or all of the Accused Products referred to by Plaintiff herein or any other products of Defendants that breach the 2008 Agreement including any future products that violate the 2008 Agreement.

41.

On information and belief, Plaintiff avers that Mayborn USA is a corporation located outside of the State of Louisiana, but exists in the United States, and which has not appointed a registered agent in this State; therefore, pursuant to La. C.C.P. art. 1261 and La. R.S. 13:3204, said Defendant should be served by registered or certified mail or by actual delivery to Mayborn USA by commercial courier.

42.

On information and belief, Plaintiff avers that all other named defendants are foreign corporations existing outside the United States, who also have not appointed a registered agent in this State, but having been found to be "one single business enterprise" with Mayborn USA may therefore be served by service on Mayborn USA, and therefore, pursuant to La. C.C.P. art. 1261 and La. R.S. 13:3204, said Defendants should be served by registered or certified mail or by actual delivery to Mayborn USA by commercial courier; however, if the courts find that said service is not valid, then said other named defendants will have to be served via the Hague convention.

**WHEREFORE, PLAINTIFF PRAYS** that all named Defendants should be served a copy of this Petition and that each be cited to appear and answer same within the time limits allowed by law, and that after all due proceedings had, that there be judgment in favor of Plaintiff, and against JACKEL, in an amount commensurate with Plaintiff's losses plus reasonable attorney's fees with legal interest thereon from the date of judicial demand until paid and for all costs of these proceedings.

**PLAINTIFF FURTHER PRAYS** that upon the trial of this matter that this Honorable Court, as part of any judgment rendered herein, order that JACKEL be prohibited and permanently enjoined from selling any or all of the Accused Products referred to by Plaintiff in this matter or any other JACKEL products that may be identified through discovery herein and found to also breach the 2008 Agreement between Plaintiff and Jackel.

**PLAINTIFF FURTHER PRAYS** for full, general and equitable relief.

Respectfully submitted this 22nd day of March, 2018.

By: _____
Joe D. Guerriero, Bar Roll No. 06391
3030 Aurora Ave., 2nd Floor
Monroe, Louisiana 71201
Telephone: (318) 338-3603
Facsimile: (318) 388-5892
Email: joed@nuby.com
*Counsel for Plaintiff Luv n' care, Ltd.*

E COPY

CLERK
RICT COU

11

DEPUTY CLERK
JUDICIAL DISTRICT COURT
A PARIS

PLEASE PREARE **LONG-ARM PACKAGES** FOR THE FOLLOWING:

**JACKEL INTERNATIONAL LIMITED**
Through Mayborn USA, Inc.
1 Edgewater Drive, Suite 109
Norwood, MA 02062

**MAYBORN USA, INC.**
Through Mayborn USA, Inc.
1 Edgewater Drive, Suite 109
Norwood, MA 02062

**JACKEL CHINA LIMITED**
Through Mayborn USA, Inc.
1 Edgewater Drive, Suite 109
Norwood, MA 02062

**MAYBORN ANZ PTY. LIMITED**
Through Mayborn USA, Inc.
1 Edgewater Drive, Suite 109
Norwood, MA 02062

**PRODUCT MARKETING MAYBORN LIMITED**
Through Mayborn USA, Inc.
1 Edgewater Drive, Suite 109
Norwood, MA 02062

**MAYBORN GROUP LIMITED**
Through Mayborn USA, Inc.
1 Edgewater Drive, Suite 109
Norwood, MA 02062

**JACKEL INTERNATIONAL LIMITED**
Attn: Company Secretary
Dudley Lane
South Cramlington Industrial Estate
Cramlington, Northumberland, NE23 7RH