# Exhibit 1

| | | |
|---|---|---|
| 1 | LUV N' CARE, LTD | STATE OF LOUISIANA |
| 2 | VERSUS NUMBER 10-1891 | PARISH OF OUACHITA |
| 3 | JACKEL INTERNATIONAL, LTD | FOURTH JUDICIAL DISTRICT |

\* \* \* \* \* \* \* \* \* \*

JUDGE DANIEL J. ELLENDER

SECTION "4"

\* \* \* \* \* \* \* \* \* \*

BE IT KNOWN AND REMEMBERED that upon the hearing of the trial in the above styled and numbered case in the Fourth District Court, Parish of Ouachita, State of Louisiana, on the 29th, 30th, 31st Days of January, and the 4th, 5th, 6th, 7th, and 8th Days of February, A.D., 2013, before Honorable Daniel J. Ellender, Judge, at Monroe, Louisiana, the following proceedings were had, to wit:

APPEARANCES:   Messrs. Morris Cohen and
Lee A. Goldberg
Attorneys at Law,
Monroe, Ouachita Parish, Louisiana
For Luv N' Care, LTD.

Messrs. James A. Grant, Gordon James, and Ms. Elizabeth Jordan
Attorneys At Law,
Monroe, Ouachita Parish, Louisiana
For Jackel International, LTD.

1  A.     That's the law.  As long as I have the rights to the goods.
2  BY MR. GRANT:
3           Your Honor, I object.
4  BY THE COURT:
5           Hold on, Mr. Hakim.
6  BY MR. GRANT:
7           That's the law?  I mean, he can't testify as to what the law is in
8           this case.  He's not a lawyer.  That's for Your Honor to tell the jury
9           what—
10 BY THE COURT:
11          I'll sustain that objection.
12 Q.     Let's just stick to what your understanding was, sir.
13 A.     All right.  My understanding is just like the Coca-Cola bottle, you can't copy
14         Coca-Cola's bottle.
15 BY MR. GRANT:
16          Your Honor, he's doing the same thing here.  He's telling the
17          jury what he thinks the law is.  That's for Your Honor to do.
18 BY THE COURT:
19          All right.  Sustained.
20 BY MR. HAKIM:
21          All right.  I'll try to rephrase it.
22 BY THE COURT:
23          Just rephrase your question, Mr. Goldberg.
24 BY MR. GOLDBERG:
25          Sure.
26 Q.     Mr. Hakim, what was your understanding of how long you could stop Jackel
27         from selling the products after the term of this agreement ended?
28 A.     As long as I'm selling the product.
29 Q.     Thank you, sir.  Let's move down to the next line.
30 A.     "Either party acknowledges receipt of confidential and non-confidential
31         proprietary information from the other party."
32 Q.     Let's just stop there for a second, sir.  What did you mean by confidential

1        and non-confidential proprietary information?
2 A. Proprietary means it's mine. I own it. Confidential means it's confidential
3        to a certain select group of people within the company or distributor who
4        signed specific documents that they want copied. That item, if they signed a
5        confidential on it, if it's a drawing, it's confidential to us. Once it goes into
6        Wal-Mart or out into the public or shown to someone that I don't have a
7        contract with, then that same product then becomes non-confidential,
8        because it's public domain.
9 Q. Can you look at the next sentence, sir?
10 A. "Distributor agrees not to use in any fashion said information or designs or
11        any colorable imitations thereof upon termination of this agreement."
12 Q. And what was your understanding of this sentence when you entered into
13        this agreement?
14 A. Once this contract is terminated, they can't use in any fashion any designs,
15        any colorable imitations. Nothing they've learned from us can they use.
16 Q. Let's stick with that for a second, sir. What did you mean by— I'm sorry.
17        Did you have any understanding of what the term use was in that sentence?
18        Not to use. What that included.
19 A. What the word use means?
20 Q. Yeah. And I know I've taken one simple word out of that whole sentence,
21        but did you have any understanding—
22 A. They can't use it. They can't— They can't use this cup 750. They can't
23        use the technology of it. They can't use the idea that I had to create it.
24 Q. When you said "they," who is they?
25 A. In this particular case, it would be Jackel, because it's a Jackel contract. So
26        Jackel could not use the idea that I dreamed up of having a compression—to
27        having a cup—no-spill cup with a valve or the body sinks in a certain way or
28        soft top spout or the configuration. Just how even the placement of the valve
29        and the type of valve to let air go back in, they couldn't take my formula that
30        I put together and they couldn't use it and they couldn't send it to any third
31        party and say, hey, you knock it off because I can't; I'm prohibited from it.
32        So they can't cause it to have copied.

| | | |
|---|---|---|
| 1 | | proceed. |
| 2 | BY MR. GOLDBERG: | |
| 3 | | Thank you, Your Honor. |
| 4 | | **DIRECT EXAMINATION, continuing** |
| 5 | **BY MR. GOLDBERG:** | |
| 6 | Q. | Mr. Hakim, just a few more questions on the 2008 agreement before we talk |
| 7 | | about a different topic.  And I'd like to point your attention to paragraph 19, |
| 8 | | sir, if you look up on the screen.  You see we went through a similar |
| 9 | | paragraph in 2003 and is wondering if we can short circuit this, sir, and to |
| 10 | | your understanding, sir, is paragraph 19 the same as paragraph 21 in the |
| 11 | | 2003 agreement? |
| 12 | A. | Yes, sir. |
| 13 | Q. | Okay.  One of these -- in the middle of that paragraph, sir, there is the term |
| 14 | | colorable imitation.  Could you tell us what that means? |
| 15 | BY MR. GRANT: | |
| 16 | | Objection.  Asked and answered.  We did this already this |
| 17 | | morning. |
| 18 | BY MR. GOLDBERG: | |
| 19 | | I just want -- |
| 20 | BY THE COURT: | |
| 21 | | How is it different, Mr. Goldberg? |
| 22 | BY MR. GOLDBERG: | |
| 23 | | This is paragraph 19 of the 2008 agreement.  I just want to |
| 24 | | make sure -- |
| 25 | BY THE COURT: | |
| 26 | | I think you already indicated that it was the exact same |
| 27 | | paragraph didn't you?  Did you say that? |
| 28 | BY MR. GOLDBERG: | |
| 29 | | Yes, I did, sir. |
| 30 | BY THE COURT: | |
| 31 | | All right.  So I'll sustain the objection. |
| 32 | BY MR. GOLDBERG: | |

1 A. Beg your pardon?
2 Q. You went over with Mr. Goldberg this morning that there was express
3 language in this contract allowing Jackel to continue to sell competing baby
4 products. Correct?
5 A. That's true.
6 Q. And you knew they were continuing to develop new baby products. Right?
7 A. Sure.
8 Q. That was not objectionable at all?
9 A. No. None.
10 Q. Okay. Now, you contend, of course, among other things in this lawsuit that
11 my clients breached paragraph 21, the confidential information clause.
12 Right?
13 A. That's true.
14 Q. Okay. So let's pull that up for a second. That's page 16. It will be on your
15 screen. You can look here or whatever you're more comfortable with.
16 You've got it?
17 A. It's on the screen.
18 Q. Okay. Very good. Now, this language says, and you went through it, but I
19 want to go through it in painstaking detail because, of course, the contract is
20 what governs here. Right?
21 A. You got it.
22 Q. Okay. It says, during the term of this agreement and continuing after the
23 expiration or termination hereof. Now, we agree that the term began
24 January 1, 2003. Right?
25 A. That's true.
26 Q. Okay. It says during that— You know, from January 1 forward, thou shall
27 not. Right?
28 A. That's when the written agreement started. Yes.
29 Q. Okay. It says either party shall not disclose, meaning tell somebody about
30 it—
31 A. That's right.
32 Q. —or make accessible, meaning give,— Right?

1 A. Yes.
2 Q. —or make use of the knowledge or information which either party attained
3     or obtained during the term of this agreement. Stop there. So the only
4     information that you obtained during the term of this agreement that's at risk
5     here, or at stake here. Right?
6 A. Yes.
7 Q. Okay. Not information beforehand?
8 A. As far as the written agreement, yes.
9 Q. Okay. Now, moving on, I call this the laundry list. It says, thou shall not
10    use information obtained from January 1 of 2003 forward with respect to
11    formula, trade secrets, products design, patents, drawings, business plans,
12    prototypes, procedures and methods, any other proprietary designs or
13    information. Do you see that?
14 A. I do.
15 Q. Can we agree or not, sir, that the word proprietary modifies all of the terms
16    that precede it in this sentence?
17 A. No.
18 Q. Are you contending in this case— And I want to make it clear to the jury.
19    —that non-confidential, non-proprietary items are protected?
20 A. I don't know what your question is, but you're asking if proprietary relates
21    to all of this other stuff.
22 Q. You said—
23 A. Proprietary means stuff I own.
24 Q. Right. You said no. I'll move now to another question.
25 A. I didn't say no. Proprietary means things that I own.
26 Q. Okay. I'll move now to another question. Are you contending that the
27    language of this clause protects non-confidential non-proprietary things?
28 A. This language protects our products, if that's what you're asking.
29 Q. I'm asking a simple question. Do you contend that it protects non-
30    confidential non-proprietary or not? Yes or no.
31 A. Protects non-confidential and confidential.
32 Q. Non-confidential and proprietary information. Right?

| | | |
|---|---|---|
| 1 | A. | It says and any other. In the laundry list, it protects the laundry list. |
| 2 | Q. | Yes, sir. |
| 3 | A. | And any other proprietary designs or information. |
| 4 | Q. | Right. So that's what I'm trying to focus on for a second here. Is it your |
| 5 | | position that this contract protects things that are not proprietary that you |
| 6 | | don't have an exclusive right to? Is that what you're telling this jury? |
| 7 | A. | It doesn't protect something that if I didn't create it, if that's what you're |
| 8 | | asking. |
| 9 | Q. | Okay. As long as it's not exclusive to you it's fair game for Jackel? |
| 10 | A. | Oh, if I didn't create, it's fair game to anybody. |
| 11 | Q. | Or if it's an idea that came from a third party before you created it is fair |
| 12 | | game for Jackel? |
| 13 | A. | If me or my staff or somebody I hired didn't create it, it's open market. |
| 14 | Q. | And if Jackel knew about it from some third party source, it would be open |
| 15 | | market. Right? |
| 16 | A. | If I didn't create it, it's anybody's. |
| 17 | Q. | My question is, if Jackel knew of an idea from a third party before January |
| 18 | | 1, 2003, it's fair game. Right? |
| 19 | A. | Yes. Yes. If they knew that somebody else had something, that's not mine. |
| 20 | Q. | Okay. |
| 21 | A. | Proprietary— I keep saying it. Proprietary means mine. Mine, proprietary. |
| 22 | Q. | ==Okay. I got it. I'm with you now. I just wanted to make sure we agreed.== |
| 23 | | ==And to short circuit it, I'm not going to go to the same clause in the 2008== |
| 24 | | ==agreement. All of these answers would apply equally that we're going== |
| 25 | | ==through right now on this very language. Right? If it's the same.== |
| 26 | A. | ==If it's the same, it's the same.== |
| 27 | Q. | Okay. I think that's what you told Mr. Goldberg. Now, the language goes |
| 28 | | on to say distributor agrees not to use in any fashion said information or |
| 29 | | designs or any colorable imitations thereof. You would agree with me that |
| 30 | | this colorable imitations thereof refers to said information or design, |
| 31 | | wouldn't you? |
| 32 | A. | Distributor agrees not to use in any fashion said information or designs or |

| | | |
|---|---|---|
| 1 | | any colorable imitations thereof upon termination. |
| 2 | Q. | I'm just trying to read the English here. |
| 3 | A. | What is the question? |
| 4 | Q. | Doesn't colorable imitations thereof refer back to said information or |
| 5 | | design? Isn't that how you read that sentence? |
| 6 | A. | Colorable imitations of any of our products. |
| 7 | Q. | So you are disagreeing with me. I just want to make sure it's clear. |
| 8 | BY THE COURT: | |
| 9 | | Mr. Grant, if you would, just go closer to the mic. |
| 10 | BY MR. GRANT: | |
| 11 | | Oh, sure. Thank you, Judge. |
| 12 | Q. | You're disagreeing with me that colorable imitations are a subset of said |
| 13 | | information or designs? You're disagreeing with that reading? |
| 14 | A. | I can only tell you what's in my mind. I don't know how you're trying to |
| 15 | | twist words. |
| 16 | Q. | I'm not trying to twist words. I'm asking if you agree with this or not? |
| 17 | A. | In my opinion—in my opinion, colorable imitations of my products. That's |
| 18 | | the only way I can answer it. |
| 19 | Q. | My question is a very simple one. I'm asking if you agree or disagree with |
| 20 | | me. You disagree, I take it, that colorable imitations is a subset of this |
| 21 | | phrase that precedes it, said information or designs? |
| 22 | A. | Subset. I'm sorry. I just don't understand what you're talking about. If you |
| 23 | | can— |
| 24 | Q. | If you don't know, I also take it you don't know whether said information or |
| 25 | | designs— When they use the word said in contracts, it refers to the things |
| 26 | | that came before. Right? |
| 27 | A. | That's right. |
| 28 | Q. | Okay. So we can agree on that. |
| 29 | A. | Said information. That's correct. |
| 30 | Q. | And it refers to the items that came before. |
| 31 | A. | Jackel can't use any of my—they can't make a colorable imitation of my |
| 32 | | products. I'm just a simple guy. |

1  Q.  Based on your communications with Jackel, did Jackel have the same
2      understanding of this language?
3  A.  Yes.
4  Q.  I'd like to go back up to 15 just for a moment. And you'll know that we
5      talked about the twelve percent and the lost sales. I just want to highlight
6      this as well. What was your understanding of this language, as well as any
7      other remedies allowed by law?
8  A.  Well, the twelve percent is basically the minimum, and then we're able to
9      recover any of our losses that are allowed by law.
10 Q.  Based on your communications with Jackel, did they share that
11     understanding?
12 A.  Yes.
13 Q.  I'd like to refer you to paragraph 19 of the executed agreement and
14     specifically there's a highlighted portion. It says, either party acknowledges
15     receipt of confidential and non-confidential proprietary information from the
16     other party. Was it your understanding that this paragraph protected
17     information that is both confidential and proprietary?
18 A.  Confidential and non-confidential proprietary information, yes.
19 Q.  Let me break it into two categories. First, confidential proprietary
20     information. Is that covered by this language?
21 A.  Yes.
22 Q.  What about non-confidential proprietary information? Was that intended to
23     be covered by this language?
24 A.  Yes.
25 Q.  Was it your understanding that both parties shared that understanding?
26 A.  Yes.
27 Q.  Why was it important to Luv N' Care to protect information that was non-
28     confidential proprietary?
29 A.  Well, when you're developing a product, until it hits the market it's
30     confidential. Once it hits the market, it's no longer confidential. Otherwise,
31     you couldn't sell it. Consumers have to be able to see it. And it couldn't be
32     seen if it was confidential.

| | | |
|---|---|---|
| 1 | Q. | And what was your understanding of the term proprietary? |
| 2 | A. | Proprietary is information that is owned by Luv N' Care, whether they |
| 3 | | created it or whether they purchased the rights to it. The rights are owned by |
| 4 | | Luv N' Care; therefore, it would be proprietary to Luv N' Care. |
| 5 | Q. | And did you believe that Jackel had the same understanding that Luv N' |
| 6 | | Care did? |
| 7 | A. | Yes. |
| 8 | Q. | I'd like to go down in the language that's highlighted. And there's a further |
| 9 | | clause that says colorable imitations thereof. Could you explain what was |
| 10 | | your intent with respect to the term colorable imitations? |
| 11 | A. | Well, colorable imitation is something that looks similar. In other words, a |
| 12 | | direct copy may be—if you copy the *Mona Lisa*, it's going to look exactly |
| 13 | | like the *Mona Lisa*. But a colorable imitation is something that's going to |
| 14 | | look similar. It's not going to necessarily be exact. |
| 15 | Q. | Was it your understanding that Jackel shared Luv N' Care's understanding? |
| 16 | A. | Yes. |
| 17 | Q. | I'd like to show you a further clause in the agreement, going back to 15C. I |
| 18 | | want to highlight this language, at a minimum. And it says, "At a minimum |
| 19 | | commission of twelve percent." Was it your understanding that Jackel's |
| 20 | | damages under this agreement could be less than twelve percent or not? |
| 21 | A. | No. |
| 22 | BY MR. GRANT: | |
| 23 | | Objection. Asked and answered two times now, Your Honor. |
| 24 | BY THE COURT: | |
| 25 | | I don't think that question has been asked. I'll overrule the |
| 26 | | objection. |
| 27 | Q. | Okay. Now, we've referred to 15. I want to bring that forward to 19. And |
| 28 | | it says at a rate not less than those set herein. Did you understand what— |
| 29 | | Well, maybe if you read the whole sentence out loud, it might be easier. |
| 30 | | Any use by distributor. |
| 31 | A. | "Any use by distributor of said information or proprietary—or property |
| 32 | | without Luv N' Care's written consent will convey royalty and commission |