## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

LUV N' CARE, LTD.                              CIVIL ACTION NO. 3:18-CV-00534

VERSUS                                         JUDGE TERRY A. DOUGHTY

JACKEL INTERNATIONL LTD.,                      MAG. JUDGE PEREZ-MONTES
N/K/A MAYBORN (UK) LTD., et al.

## RULING

Pending before the Court is Defendant Mayborn Group Limited, Jackel International Limited, Mayborn USA, Inc., Jackel China, Ltd., Mayborn Anz Pty, Ltd., and Product Marketing Mayborn, Ltd.'s (collectively "Mayborn") "Motion for Summary Judgment that LNC's Claims are Barred by the Doctrines of Res Judicata, Waiver, and Equitable Estoppel" [Doc. No. 211].[1] Plaintiff Luv n' care, Ltd.'s ("LNC") responded to the motion. [Doc. No. 227]. Mayborn filed a reply. [Doc. No. 255]. For the following reasons, the motion is DENIED AS MOOT.

Also pending before the Court is Mayborn's "Motion for Summary Judgment Concerning Issues of Contractual Interpretation" [Doc. No. 212]. LNC responded to the motion. [Doc. No. 227]. Mayborn filed a reply. [Doc. No. 255]. For the following reasons, the motion is DENIED AS MOOT.

Also pending before the Court is Mayborn's "Motion for Partial Summary Judgment that Certain Features are not 'Proprietary' to LNC" [Doc. No. 213]. LNC responded to the motion. [Doc. No. 227]. Mayborn filed a reply. [Doc. No. 255]. For the following reasons, the motion is DENIED AS MOOT.

---

[1] Citations to the parties' filings are to the filing's number in the docket (Doc. No.) and pin cites are to the page numbers assigned through ECF.

Also pending before the Court is Mayborn's "Motion for Summary Judgment that Pre-2003 Mayborn Product Features Cannot be the Basis of Breach" [Doc. No. 214]. LNC responded to the motion. [Doc. No. 227]. Mayborn filed a reply. [Doc. No. 255]. For the following reasons, the motion is DENIED AS MOOT.

Also pending before the Court is Mayborn's "Motion for Summary Judgment, that the Surviving Provisions are Null and Void Under Louisiana's Noncompetition Statute" [Doc. No. 229]. LNC responded to the motion. [Doc. No. 235]. Mayborn filed a reply. [Doc. No. 257]. For the following reasons, the motion is DENIED.

Also pending before the Court is LNC's "Cross Motion for Partial Summary Judgment Based on Offensive Collateral Estoppel" [Doc. No. 242]. Mayborn responded to the motion. [Doc. No. 260]. LNC filed a reply. [Doc. No. 261]. Mayborn filed a sur-reply to the motion. [Doc. No. 264]. LNC filed a sur-response. [Doc. No. 267]. For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

LNC is a Louisiana corporation with its place of business in Monroe, Louisiana. LNC designs, manufactures, and sells baby products under the "Nuby" brand name. Mayborn is also in the business of designing, manufacturing, marketing, and selling baby products. Mayborn sells its own products under the brand name Tommee Tippee.

In 2003 and 2008, Mayborn and Luv N' Care (LNC) entered into two agreements ("Distribution Agreements") whereby the parties would utilize common distribution channels to get LNC products into the United Kingdom, Ireland, and Gibraltar.[2] At some point in or around

---

[2] The "2003 Agreement" can be found at Doc. No. 63-1 at 1-37, and the "2008 Agreement" can be found at Doc. No. 63-1 at 38-117.

2010, the relationship between the two parties deteriorated, which spawned into the following litigation.

### A.  The Previous Litigation

In May 24, 2010, LNC brought suit against Mayborn in state court alleging breach of the Distribution Agreements  by selling certain soft-spout, flip-top, and straw cups with a silicone compression valve ("*LNC I*").[3]  Mayborn denied copying or using LNC's product designs, and filed reconventional demands seeking a declaratory judgment that the 2003 and 2008 Agreements were unenforceable. [Doc. No.134-3 at ¶130].  *LNC I* went to trial, and the jury found in favor of LNC and against Mayborn on LNC's claims of  breach of the Distribution Agreements and the Louisiana Unfair Trade Practices Act ("LUTPA").

A judgment was entered on May 22, 2013, which provided that Mayborn breached the Distribution  Agreements "with respect to Jackel's (1) soft spout cups; (2) flip-top cup; and (3) straw cup." [Doc. No. 63-2 at 1].  More  specifically, the "Litigated Products" were identified in Exhibit A to the Judgment: (1) First Cup; (2)  Kids on the Go Active Cup; (3) Tip It Up Cup; (4) Tip It Up Trainer Cup; (5) Tip It Up  Beaker Cup; (6) Tip It Up Sportster Cup; and (7) Tip It Up Flip Top Cup.

---

[3] "*LNC I*" refers to *Luv n' care, Ltd. v. Jackel International Limited*, Civil Action No. 2010-1891, 4th Judicial District for the Parish of Ouachita, State of Louisiana.

*Id.* at 3.  The jury also found (and the court concluded) that (1) Defendant and its affiliates are a single business entity bound by the terms of both distribution agreements; (2) both distribution agreements are valid and not void as against public policy; and (3) Defendant violated the LUTPA. [Doc. No. 63-1 at 118-122; Doc. No. 63-2 at 1-3].

Following the jury verdict, the state court entered a permanent injunction enjoining Mayborn from selling any of the Litigated Products "as well as any further versions thereof" or other non-litigated products not in existence at the commencement of the January 2013 trial that are copies and/or colorable imitations of "Plaintiff's silicone compression valve: (1) soft spout cups; (2) flip-top cups; or (3) straw cups." [Doc. No. 63-2 at 4].  On May 3, 2013, before the entry of final judgement in *LNC I,* LNC filed a second state court action ("*LNC II*") in the 4th Judicial District Court for the Parish of Ouachita, alleging that Mayborn's sales of "additional products" also breached the same agreements and violated LUTPA. [Doc. No. 28-6].  Mayborn removed that lawsuit to federal court.  LNC voluntarily dismissed *LNC II* on August 27, 2013.

Although all parties appealed the judgment in *LNC I,* the appeal was settled and dismissed on November 21, 2013.  On August 14, 2014, LNC filed a third action ("*LNC III*") in the Eastern District of Texas against Mayborn.  In that lawsuit, LNC focused on the "additional products"

from *LNC II* and added patent infringement claims and LUTPA claims.   The district court dismissed LNC's breach of the distribution  agreements and the LUTPA claims as barred by res judicata.   The patent case settled, and the res  judicata decision was never appealed.  A final judgement in *LNC III* issued on December 18, 2015, and *LNC II* and *LNC III* were dismissed with prejudice.  In October 2015, LNC filed *LNC IV* in the 4th Judicial District Court for the Parish of Ouachita, alleging breach of contract and LUTPA claims as to Mayborn's "Non-Spill" Insulated Straw Tumbler.  *LNC IV* was dismissed without prejudice, after the parties executed a settlement agreement dated December 18, 2015.

On March 23, 2018, LNC filed suit against Mayborn in the Fourth Judicial District Court, Ouachita Parish, Louisiana, and the case was removed to this Court shortly thereafter.   The "Accused Products" at issue in this case are: (1) the Insulated Straw Tumbler; (2) the Trainer Straw Cup; (3) the Tuff Stuff Straw Tumbler; and (4) the Transition Cup. [Doc. No. 78 at ¶ 38]. These four Accused Products were not at issue in *LNC I.*  LNC contends that in marketing and selling the Accused Products, Mayborn has "willfully and intentionally breached one or both distribution agreements by improperly using LNC's products, product designs, and non-confidential proprietary information to market and sell competing products without LNC's consent and without paying the royalty Jackel expressly agreed it would pay." [Doc. No. 210-1 at 5].

In response to the Complaint, Mayborn moved for sanctions and, upon the filing of LNC's proposed Amended Complaint, sought sanctions in a second motion. [Doc. Nos. 28, 47].  On December 5, 2018, the Court held an evidentiary hearing on Mayborn's sanctions motions.  The hearing focused on the Distribution Agreements, the State Court Action Judgment and Permanent Injunction, the First Settlement Agreement which was limited to the seven Litigated Products,

the four Accused Products, and various product designs contained in LNC's Nuby and *Natural Touch* branded products.  On March 14, 2019, the Court denied both sanctions motions and granted LNC's leave to amend the Complaint. [Doc. Nos. 76, 77].  LNC filed an Amended Complaint on that same day. [Doc. No. 78].  A state court case is also pending, but is stayed pending the resolution of this case. [Doc. No. 198-1 at 8 (Hearing Tr. *Luv N' Care v. Jackel International Ltd.*, No. 19-2306, April 14, 2021 (4th JDC, Ouachita Parish))].

On February 8, 2021, Mayborn filed its Answer and Counterclaim to LNC's Amended Complaint. [Doc. No. 168].  Mayborn's Counterclaim contains five counts.  Counts I and II seek declaratory judgments that LNC's claims are barred by the doctrines of collateral estoppel, res judicata, acquiescence, and waiver. *Id.* at ¶¶ 105–14.  Count III pleads unfair competition in violation of LUTPA by LNC's predatory litigation. *Id.* at ¶¶ 115–22.  Count IV pleads breach of contract because "[t]o the extent LNC's allegations of breach of contract against Mayborn are valid, the 2003 and 2008 distribution agreements must then also prohibit LNC from using in any fashion Mayborn's products or product designs and the agreements then impose continuing obligations not to do so on the part of LNC." *Id.* at ¶¶ 123–34.  Count V pleads unfair competition in violation of LUTPA by LNC's conduct surrounding its breach of contract. *Id.* at ¶¶ 135–49.

On May 24, 2021, the parties held a status conference and agreed to have an "early dispositive motion" period. [Doc. No. 197].  On November 2, 2021, the Court denied LNC's Motion for Leave to File Second Supplemental and Amending Complaint [Doc. No. 102], which started the early dispositive motion period.  Mayborn filed five summary judgment motions [Doc. Nos. 211–214, 229], and LNC filed two summary judgment motions [Doc. Nos. 210, 242].  By the parties' agreement, and with the Court's permission, discovery has been stayed in this case until this round of summary judgment motions have been briefed and decided.

## II.   LAW AND ANALYSIS

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 811 (5ᵗʰ Cir. 2019) (citation omitted).  And "[a] fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In opposing a motion for summary judgment, the adverse party must "designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted).  "This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation marks and citations omitted).  In determining whether the movant is entitled to summary judgment, the Court "view[s] facts in the light most favorable to the non-movant and draw[s] all reasonable inferences in her favor." *Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 533 (5th Cir. 1997).  In sum, summary judgment is appropriate if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

### B. Collateral Estoppel or Issue Preclusion

Collateral estoppel is a doctrine of equitable discretion to be applied only when the

alignment of the parties and the legal and factual issues raised warrants it.  The discretion vested in trial courts to determine when it should be applied is broad. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331, 99 S. Ct. 645, 651 (1979).  Its application is controlled by the principles of equity, and fairness to both parties must be considered when it is applied. *Johnson v. United States*, 576 F.2d 606, 614 (5th Cir.1978), cert. denied, 451 U.S. 1018, 101 S. Ct. 3007 (1981).

Louisiana law governs the preclusive effect of judgments rendered by Louisiana courts. *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 436 (5th Cir. 2000) (stating that the full faith and credit statute requires a federal court to "refer to the preclusion law of the state in which judgment was rendered").  Louisiana law embraces the doctrine of collateral estoppel or issue preclusion, and provides as follows:

> Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
>
> . . . . (3) **A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any *issue* actually litigated and determined if its determination was essential to that judgment.**

*Liberty Mut. Fire Ins. Co v. Weaver*, 16-1008 (La. App. 3 Cir. 5/10/17), 219 So. 3d 442, 445 (quoting La. Rev. Stat. § 13:4231 (emphasis added)).  In other words, "resolution of an issue of fact or law essential to determination of the dispute precludes relitigation of the same issue in a different action between the same parties." *Pal v. Stranco*, 10-1507 (La. App. 1 Cir. 8/3/11), 76 So. 3d 477, 482.

Three elements are required for issue preclusion: (1) a valid and final judgment; (2) identity of parties; and (3) an issue that has been actually litigated and determined if its determination was essential to the prior judgment. La. Rev. Stat. § 13:4231(3); *Liberty Mut.*,

219 So. 3d at 445-46 (citation omitted).[4]  With respect to the third element, the Fifth Circuit has held, "[t]he requirement that an issue be 'actually litigated' for collateral estoppel purposes simply requires that the issue is raised, contested by the parties, submitted for determination by the court, and determined." *In re Keaty*, 397 F.3d 264, 272 (5th Cir. 2005). The *Keaty* court further explained that "the scope of collateral estoppel is circumscribed by the particularized findings of the state court. *Id.* at 271.

The parties agree that the first two elements required for issue preclusion are met. *See, e.g.*, Doc. No. 246 at 11 (LNC arguing that "the only element requiring resolution by the Court is the third: whether the issue was actually litigated, determined, and its determination was essential to the prior judgment."); Doc. No. 211-1 at 18 (Mayborn arguing that "[t]he first two elements are satisfied by *LNC I* because the state court entered a valid and final judgment.... The third requirement for res judicata is satisfied as well, as the plaintiffs and defendants in *LNC I* overlap with those here."). Thus, the only element requiring resolution is determining whether the issue was raised, contested by the parties, submitted for determination by the court, and determined.  For the following reasons, the Court finds that collateral estoppel is applicable, but in the interest of equity and fairness, does not apply it as argued by the parties in their briefing.

LNC argues for a "feature-based" theory of collateral estoppel.  Specifically, LNC argues that the overall design is protected and that the protected design necessarily includes each aspect of the overall design that was pointed out to the jury. *See, e.g.*, 261 at 8.  For example, LNC

---

[4] The United States Fifth Circuit has stated: *"this circuit has held that because [La. Rev. Stat.] § 13:4231 is modeled on federal doctrine and the RESTATEMENT OF JUDGMENTS, we can consult federal jurisprudence for guidance when interpreting it." In re Keaty*, 397 F. 3d 264, 271 (5th Cir. 2005); *Lafreniere Park Found. v. Broussard*, 221 F.3d 804, 808 (5th Cir. 2000) (stating that federal jurisprudence may be consulted for guidance in interpreting Louisiana's res judicata principals and the Restatement of Judgments).

contends that the Accused Products breach the Distribution Agreements in this case because they allegedly include "one or more" of the following specific features or "product designs" of complete products:

> 18.   During the term of the 2003 and 2008 Distribution Agreements, LNC disclosed and shared with Jackel many of LNC's product designs.  The LNC product designs shared with Jackel included, but are not limited to the following: (1) a cup with a soft or silicone top, (2) a cup with a soft or silicone top having a spout, (3) a cup with a sculptured body, (4) a cup with a silicone top having a spout and recessed one piece valve, (5) a gripper cup,  (6)

> a straw having a valve, (7) a straw having a valve inside the straw, (8) a football helmet flip-it cup with a straw having a valve, (9) a straw cup with a silicone valve, (10) a cup with a top having a silicone insert so part of the top is hard and part is soft, (11) silicone tops having a valve for air replacement, (12) a straw with an air dimple vent, (13) a cup with a soft or silicone top having a spout and compression valve, and (14) the configurations of LNC's products (collectively the LNC Product Designs).

[Doc. No. 78 at ¶ 18].  Paragraph 38 of the Amended Complaint specifically identified the Accused Products being sold by Mayborn as (1) the Transition Cup; (2) the Straw Tumbler; (3) the Trainer Straw Cup; and (4) the Insulated Straw Tumbler. [Doc. No. 78 at ¶ 38].  LNC further contends that while the *LNC I* Litigated Products each contained a compression valve inside the spout or straw in addition to the other design aspects, the absence of a compression valve in the Accused Products is a distinction without a difference. [Doc. No. 246 at 32].

Mayborn contends that the record shows that LNC did not accuse individual features at trial. [Doc. No. 260 at 14].  According to Mayborn, "[t]he record reveals that LNC narrowed its

theory at trial, abandoning allegations against individual features and instead targeting all of the features in an entire product." [Doc. No. 255 at 8].  The Court finds that neither party correctly and accurately states the issue that was raised, argued, decided, and determined to be essential to the *LNC I* Final Judgment.

Specifically, the issue raised, argued, and determined in *LNC I* was that an accused product breaches the Distribution Agreements when it includes a silicone compression valve, and is a copy and/or colorable imitation of LNC's (1) soft spout cups; (2) flip-top cups, or (3) straw cups.  Moreover, this issue was decided and determined to be essential to the Final Judgment.  Thus, the Court finds that the doctrine of issue preclusion applies, and an accused product breaches the Distribution Agreements if it includes LNC's silicone compression valve, and is a copy and/or colorable imitation of LNC's (1) soft spout cups; (2) flip-top cups, or (3) straw cups.

LNC argues that it can establish breach by showing that the Accused Products are colorable variations of the *LNC I* Litigated Products, without regard to whether the Accused Products includes a silicone compression valve. [Doc. No. 246 at 20-32].  LNC's position is contradicted by the *LNC I* final judgment, which was intentionally limited to a silicone compression valve in specific products.  In its Reasons for Judgment, the *LNC I* court described why it limited the judgment to "Jackel's (1) soft spout cups; (2) flip-top cup; and (3) straw cup . . . (the 'Litigated Products')." [Doc. No. 47-4 at 2].  The court explained how LNC "suggested extending the Judgment to all cups, regardless of their color combination, size, packaging, names and/or brands," and "[i]n denying this request, the Court believes that such language would extend the Judgment **beyond the jury's verdict**, which involved *specific* '**Litigated Products.**'" *Id.* at 5 (emphasis added).

LNC's position also contradicts the *LNC I* permanent injunction.   In requesting a permanent injunction, LNC originally attempted to extend the injunction to "any products that are copies and/or colorable imitations of Luv n' Care, Ltd.'s: (1) soft spout cups; (2) flip-top cups with a valve and a straw; or (3) straw cups with a valve in the straw." (Doc. No. 134-8 at 3).   Mayborn argued that if the court accepted LNC's proposal, it would not "matter what changes [it] makes to avoid further violations of the Distribution Agreement, it will risk being held in contempt if any aspect of the redesign product is believed by LNC to be the same as, or even an imitation of, the Accused Products (whether it is the shape or appearance of the base, the use of a soft spout, the use of a screw ring, having a spout that operates on compression, the use of silicone, etc.)." *Id.* at 21.

Mayborn further pointed out that LNC's proposed injunction "would require the Court to hold a series of perpetual mini-trials without the aid of a jury." *Id.*   Turning to the post-trial briefing, LNC itself recognized that it accused Mayborn of copying specific LNC "cup" products, each of which included LNC's compression valve:

> Throughout trial, the evidence overwhelmingly showed that Defendants copied, used, and imitated **LNC's concept of a soft spout cup with a silicone compression valve, LNC's concept of a straw cup with a silicone compression valve, and LNC's concept of a flip-top cup with a silicone compression valve (collectively, "LNC's Three Concepts").** The evidence further showed that LNC was the first to actually design and sell cups embodying these concepts. The Jury determined that each and every one of the Defendants' products at issue, regardless of the shape of the cup breached the Distribution Agreements and violated LUTPA. . . . Taken together, **the inescapable conclusion is that the Jury found that the Defendants breached the Agreements by selling colorable imitations of LNC's Three Concepts**. This is precisely the scope of the injunction that LNC is seeking and has proposed in paragraph 5(a) of the Proposed Final Judgment that was submitted to the Court on March 8, 2013.

[Doc. No. 47-10 at 18-19] (emphasis added).  As LNC indicated, its proposed injunction was

similarly limited.  Thus, after originally seeking a broader injunction against "any products that are copies and/or colorable imitations of Luv n' Care, Ltd.'s: (1) soft spout cups; (2) flip-top cups with a valve and a straw; or (3) straw cups with a valve in the straw," LNC "narrowed the scope of the proposed injunction . . . in order to ensure that the requested relief does not go beyond Defendants' scope of liability as decided by the Jury." [Doc. No. 47-10 at 19, n.16].  The court agreed and issued an injunction prohibiting "copies and/or colorable imitations of **Plaintiff's silicone compression valve**: (1) soft spout cups; (2) flip-top cups; or (3) straw cups." [Doc. No. 47-4 at 9] (emphasis added).  In other words, the injunction prohibited cups with LNC's silicone compression valve, and did not prohibit cups with just the silicone top and the dome vent, as LNC now alleges.

Approximately four years later, the *LNC I* court revisited the permanent injunction and explained the importance of the silicone compression valve to the *LNC I* verdict.  In denying LNC's request to hold Mayborn in contempt, the court explained that:

> A lengthy trial was held in 2013 involving **specific Mayborn products alleged to each contain a silicone compression valve similar to LNC's valves**, with the jury finding Mayborn's products breached distribution agreements between the parties. . . . **Those products contained silicone compression valves** similar to LNC's valves and resulted in an injunction prohibiting Mayborn's use of any of those litigated products as well as any colorable imitations of LNC's valve.

[Doc. No. 56-6 at 3-5] (emphasis added).  Again, the court did not say that "the basis for the breach were [Mayborn's] cup products having a (1) soft silicone offset spout or centered straw made of clear silicone, and (2) 'a dome vent,'" as LNC now contends. [Doc. No. 246 at 21]. The court further explained that:

> To say that any opening in a silicone soft spout top that allows liquid to flow through it when compressed constitutes a valve, and is therefore a colorable imitation of LNC's silicone compression valve, **would significantly expand the jury's finding and the**

**injunction issued by this Court**…. If the Court were to accept LNC's definition of its soft spout compression valve being the entire silicone top, there would be no significant distinction between a silicone top with a nipple, and a silicone top with a spout. **Any product containing a silicone top that has a hole in it that liquid flows through when compression occurs, like a silicone top with a nipple, would arguably fall within the scope of the injunction, which the Court finds was not the intent or purpose of the injunction.**

**The jury decided that specific Mayborn products violated distribution agreements between the parties. Those products contained silicone compression valves similar to LNC's valves and resulted in an injunction prohibiting Mayborn's use of any of those litigated products as well as colorable imitations of LNC's valve.** LNC's soft spout silicone compression valve from the 2013 trial regulates the flow of liquid by a portion of the silicone at its slits moving to open, and then moving to close, based on the application of compression and the release of compression. The litigated products contain a slit that only opens when the silicone top is compressed, such as when a child bites down and/or sucks on the device, then closes when compression is released. Whether it is referred to as a slit, a hole, an opening, a port, or any other term used to describe the location where the liquid flows through the silicon top, the Court believes this location in the silicon structure of the litigated LNC product is the valve, and that this valve definitively moves when compression occurs or when compression is released. **This is the design feature of LNC's soft spout silicone compression valve which the Court believes Mayborn is prohibited from using in its products pursuant to the injunction.**

[Doc. No. 56-6 at 4-5] (emphasis added).  The court went on to state that "[t]his basic requirement of a valve is consistent with the design of the LNC and Mayborn litigated products from the 2013 trial as these products have slits that move when compression occurs." *Id.* at 6. The Court concluded that "the silicone top of the Mayborn product does not contain a valve, nor is the top itself a valve, much less a colorable imitation of LNC's soft spout silicone compression valve that was the subject of the prior litigation." *Id.*  The court dismissed LNC's Rule for Contempt with all cost accessed against LNC. *Id.*

LNC attempts to downplay the importance of the compression valve in *LNC I.*

Specifically, LNC advances the incompatible arguments that (1) "[t]he Final Judgment on the Jury's Verdict is broader than the Permanent Injunction," which "was more narrowly tailored to products containing a 'compression valve'" and (2) "the jury in *Jackel I* necessarily found the mechanism inside the straw or spout to be irrelevant to their verdict." [Doc. No. 246 at 33, n.59]. Contrary to LNC's contention, the compression valve was central to the jury's verdict, and this is the reason the *LNC I* court "narrowly tailored" the injunction to products containing a compression valve, and dismissed LNC's Rule for Contempt for products that did not contain a compression valve. [Doc. No. 47-4 at 9; Doc. No. 56-6 at 6].  Indeed, LNC argued in *LNC I* that it "narrowed the scope of the proposed injunction [to include the compression valve] . . . in order to ensure that the requested relief does not go beyond Defendants' scope of liability as decided by the Jury." [Doc. No. 47-10 at 19, n.16].

Accordingly, the Court finds that LNC is barred under the doctrine of issue preclusion from relitigating whether an accused product that does not include LNC's silicone compression valve breaches the Distribution Agreements.  Likewise, Mayborn is barred under the doctrine of issue preclusion from arguing that an accused product that includes LNC's silicone compression valve, and is a copy and/or colorable imitation of LNC's (1) soft spout cups; (2) flip-top cups, or (3) straw cups does not breach the Distribution Agreements.

### C.  Mayborn's Four Motions for Summary Judgment (Doc. Nos. 211, 212, 213, 214)

Mayborn included a preliminary statement in its four motions for summary judgment [Doc. Nos. 211-214] stating that its first motion "seeks summary judgment that LNC is barred from asserting its feature-based theory of breach under one or more of the doctrines of res judicata, waiver, and equitable estoppel." *See, e.g.*, Doc. No. 211-1 at 6.  Mayborn contends that if the first motion is decided in its favor, then no other motions need to be addressed because it is case dispositive and requires no rulings on contractual interpretation. *Id.*

As discussed above, the Court finds that issue preclusion applies and precludes LNC from asserting a feature-based theory of breach except for accused products that include LNC's silicone compression valve, and are copies and/or colorable imitations of LNC's (1) soft spout cups; (2) flip-top cups, or (3) straw cups.  Although the Court disagrees that res judicata applies to the Accused Products as argued by Mayborn in its first motion, the Court's issue preclusion finding effectively reaches the same result, and narrows the parties' dispute to determining whether the Accused Products include LNC's silicone compression valve.  Accordingly, Mayborn's four motions for summary judgment are DENIED AS MOOT.

### D.  Mayborn's "Motion for Summary Judgment, that the Surviving Provisions are Null and Void Under Lousiana's Noncompetition Statute" [Doc. No. 229]

Mayborn argues that LNC admitted that all the surviving provisions of the Distribution Agreements at issue in this case restrict only Mayborn's future activities and not LNC's. [Doc. No. 229-1 at 4] (citing Doc. No. 210-1 at 2).  According to Mayborn, the consequence of LNC's admissions is that only Mayborn is "restrained from exercising a lawful profession or trade" by the surviving provisions and that, as such, Mayborn and LNC are not "on equal footing" with respect to these provisions. *Id.*  Mayborn contends that this means the surviving provisions are "null and void" under Louisiana's noncompetition statute (§ 23:921) as a matter of law. *Id.*

LNC responds that La. Rev. Stat. § 23:921 does not apply to contracts between corporate entities on "equal footing." [Doc. No. 235 at 7].  LNC argues Mayborn has failed to present any competent summary judgment evidence establishing that Mayborn and LNC were not on "equal footing" when they entered the Distribution Agreements. *Id.*  LNC further contends that the record evidence establishes that they were on "equal footing." *Id.*  LNC also argues that the law does not prevent two sophisticated businesses from contractually agreeing to a non-reciprocal royalty provision. *Id.*  The Court agrees with LNC.

In *La. Smoked Prods., Inc. v. Savoie's Sausage & Food Prods., Inc.*, 696 So. 2d 1373 (La. 07/01/97), the Louisiana Supreme Court explained that La. Rev. Stat. § 23:921 was "not intended to protect independent corporations of [sic] on an equal footing from a bad bargain." *Id*. at 1381.  Under *Savoie*, when two companies are on equal footing, they are "free to contract for any object that is lawful, possible, and determined or determinable." *Id*. at 1380 (citing La. Civ. Code art. 1971).  Thus, "[u]nless the district court concludes that the corporations were not on an equal footing, the district court should find that Louisiana Revised Statute Annotated § 23:921 has no application and the contract provision should be enforced." *Sec. Alarm Fin. Enters. v. Green*, No. 06-30332, 2007 U.S. App. LEXIS 4836, at *10 (5th Cir. Mar. 2, 2007).

Citing *Winston v. Bourgeois, Bennett, Thokey and Hickey*, 432 So. 2d 936 (La. Court of Appeals, 4th Circuit, 1983), the court in *Savoie* identified six factors in determining whether two companies are on equal footing under a contract:

> (1) whether all concerned are bound equally to the covenant;
> (2) whether the terms are fair to each party in all respects;
> (3) the amount of control over the individual;
> (4) whether the person is subject to the wishes of a controlling majority;
> (5) the circumstances under which the contract was executed; and
> (6) the effect on the individual's right to engage freely in his occupation after the association terminates.

*Savoie,* 696 So. 2d at 1380.  As this list indicates, determining whether two companies are on equal footing is a fact intensive inquiry.  And, as the moving party, Mayborn bears the burden of providing summary judgment evidence to establish that Mayborn was not on an equal footing with LNC when it entered the Distribution Agreements.  Mayborn failed to offer this evidence. Instead, Mayborn claims they were not on equal footing with LNC because the agreed royalty provision was not reciprocal, because of LNC's current litigation strategy, or because of other disputed material facts. [Doc. No. 257 at 14-17].

However, summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The Court finds that there are genuine issues of material fact related to whether LNC and Mayborn were on equal footing when they entered into the Distribution Agreements.

More importantly, the Court finds that the principle of res judicata requires denying Mayborn a second bite at the proverbial apple.  The Louisiana Supreme Court has held that a second action is precluded when each of the following elements is satisfied: (1) the first judgment is valid; (2) the first judgment is final; (3) the parties are the same; (4) the causes of action asserted in the second suit existed at the time of final judgment in the first suit; and (5) the causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation. *Burguieres v. Pollingue*, 2002-1385 (La. 2/25/03), 843 So. 2d 1049; La. Stat. Ann. § 13:4231.  Here the elements of res judicata are satisfied.

Specifically, the first two elements are satisfied by *LNC I* because the state court entered a valid and final judgment.  A *valid* judgment is one "rendered by a court with jurisdiction over both the subject matter and the parties after proper notice was given." *Burguieres*, 843 So. 2d at 1053 (citing La. Rev. Stat. Ann. § 13:4231, cmt. (d)).  A *final* judgment is "one that disposes of the merits in whole or in part." *Id.*  Both elements are present.  Jurisdiction was proper, given the Louisiana state law causes of action at issue, and the judgment finally resolved (1) LNC's breach of contract claims, (2) the LUTPA claims, and (3) Mayborn's defenses. [Doc. No. 47-4, *LNC I* Final Judgment].

The third requirement for res judicata is satisfied as well, as the plaintiffs and defendants

in *LNC I* overlap with those here. [Doc. No. 23-2, LNC's 2d. Amd. Pet. in *LNC I*].  Accordingly, the third element is satisfied with respect to *LNC I*.  The fourth element of res judicata is also met because Mayborn's Reconventional Demand asserting that the Distribution Agreements were void as against public policy was fully litigated before the jury at the *LNC I* trial.  Mayborn asked the jury whether the Distribution Agreements were void as against public policy, and the jury answered: "No." [Doc. No. 63-1 at 119].  The issue was the same then as it is now, and it was decided in LNC's favor and against Mayborn in *LNC I*.

The fifth element is satisfied because LNC's breach and LUTPA claims arise out of the same transaction or occurrence as that in *LNC I*.  There is no dispute that the Distribution Agreements at issue here were at issue in those cases.  Courts have routinely explained that, "[w]here there is a legal relationship such as [] a lease or contract, all claims arising from that relationship will arise from the same subject matter and be subject to res judicata." *Weaver v. Tex. Capital Bank N.A.*, 660 F.3d 900, 907 (5th Cir. 2011) (applying Texas law) (quotation marks and citation omitted).  Accordingly, each element is met and Mayborn is barred by res judicata from arguing that the Distribution Agreements were void as against public policy.  Thus, Mayborn's Motion for Summary Judgment, that the surviving provisions are null and void under Lousiana's Noncompetition Statute is DENIED.

### E.  LNC's "Cross Motion for Partial Summary Judgment Based on Offensive Collateral Estoppel" [Doc. No. 242]

LNC argues that Mayborn seeks to relitigate issues it lost in *LNC I* in clear violation of the basic principles of res judicata and collateral estoppel. [Doc. No. 246 at 7].  Specifically, LNC contends that its seeks to preclude Mayborn from relitigating the following five issues:

- Whether the Distribution Agreements violate La. Rev. Stat. § 23:921;

- Whether the Distribution Agreements are void as against public

policy;

- Whether the seven Jackel I Litigated Products (which included soft silicone spouts, soft silicone centered straws, and a soft silicone straw flip-it top) violate one or both of the Distribution Agreements;

- Whether the Distribution Agreements bar the Jackel Defendants from using in any fashion, copying, or colorably imitating LNC's designs without LNC's written permission, and require the Jackel Defendants to pay LNC a royalty if they do so; and

- Whether LNC's soft silicone spouted cups, center straw cups, and Flip-It straw cups and their incorporated designs – including but not limited to a soft, silicone top with an offset spout and air vent dimple valve, a soft, silicone top with a flexible silicone straw and air vent dimple valve, and a soft, silicone flexible straw with a flip top – are contractually protected designs under the Distribution Agreements.

*Id.* at 7-8.  According to LNC, the law does not require it to relitigate and reprove what it has already established. *Id.* at 8.  LNC further argues that the law does not allow Mayborn a second bite at the apple as to factual disputes and legal issues already resolved against it. *Id.*

Mayborn responds that LNC's five requests ignore the record from the previous litigation, including the fact that LNC intentionally narrowed its contract interpretation at trial. [Doc. No. 260 at 4].  Mayborn contends that LNC won *LNC I* on its narrowed argument, and that LNC now wants to resurrect its broad feature-based interpretation while simultaneously asserting that the validity of the Agreements is forever protected by res judicata. *Id.*  According to Mayborn, the jury never considered LNC's current interpretation, which it contends LNC explicitly gave up before trial. *Id.*  Thus, Mayborn argues that collateral estoppel cannot apply to an issue that was never litigated. *Id.*

Mayborn also argues that LNC stretches the prior judgment to cover individual, unlitigated features that happen to be in the *LNC I* products, but ignores the compression valve that was central to its jury argument and its post-trial briefing. *Id.*  Mayborn contends that LNC ignores this, along with a host of other statements from the *LNC I* record that contradict its

position and preclude each of its requests. *Id.*  Finally, Mayborn argues that the law LNC relies

on requires a comparison of every element previously found to infringe, and where one or more

of those elements has been modified in a significant way, the newly accused product is deemed

different from the adjudged infringing one. *Id.* at 4-5.  Mayborn contends that LNC does not

argue that the presently accused products contain every element that it accused in the *LNC I*

Litigated Products, thereby precluding its motion for offensive collateral estoppel. *Id.* at 5.

As discussed above regarding the collateral estoppel finding, the Court agrees that LNC

ignores the fact that the compression valve feature was central to the jury verdict and its post-

trial briefing.  Accordingly, LNC is barred under the doctrine of issue preclusion from

relitigating whether an accused product that does not include LNC's silicone compression valve

breaches the Distribution Agreements.  Instead, LNC can only argue that an accused product

breaches the Distribution Agreements if it includes LNC's silicone compression valve, and is a

copy and/or colorable imitation of LNC's (1) soft spout cups; (2) flip-top cups, or (3) straw cups.

With this understanding, the Court also finds that res judicata bars Mayborn from

relitigating the issues of whether the Distribution Agreements between LNC and Mayborn run

afoul of La. Rev. Stat. § 23:921, and whether the Distribution Agreements are void as against

public policy.  The Court's reasoning and analysis for this conclusion is discussed above in the

section titled "Motion for Summary Judgment, that the Surviving Provisions are Null and Void

Under Lousiana's Noncompetition Statute" [Doc. No. 229].  Accordingly, LNC's motion for

these two points is GRANTED, with the understanding that collateral estoppel and res judicata

bars both parties from relitigating certain issues.

LNC next asks the Court to "recognize[e] in this proceeding that the seven *Jackel I*

Litigated Products (containing soft silicone spouts, soft silicone centered straws, and soft-

silicone straws with flip-it tops) violate one or both of the Distribution Agreements." [Doc. No. 246 at 8].  This is a strange request because the *LNC I* judgment already recognizes that "Jackel breached the 2003 or 2008 Distribution Agreements with respect to Jackel's (1) soft spout cups; (2) flip-top cup; and (3) straw cup." [Doc. No. 47-4 at 2].  The judgment also included "[a] photograph of each Jackel cup that was at issue in the case and actually litigated" and labeled these "the 'Litigated Products'." *Id.*

By asking the Court to recognize that "the seven *Jackel I* Litigated Products (containing soft silicone spouts, soft silicone centered straws, and soft-silicone straws with flip-it tops) violate one or both of the Distribution Agreements," LNC appears to be requesting the Court to find that the Distribution Agreements was violated on the basis of those products "containing" those features. [Doc. No. 246 at 13-14].  For the reasons explained above, this is an inaccurate recounting of the *LNC I* history and the jury's verdict.  To the extent that LNC is asking the Court to certify its feature-based theory, the Court rejects that argument and reiterates that collateral estoppel and res judicata bars both parties from making certain arguments.  Accordingly, LNC's motion for this point is DENIED.

Likewise, LNC's fourth request glosses over a key term in the Distribution Agreements, and also misrepresents the basis of the jury's findings in *LNC I*.  Specifically, LNC asks the Court to find that "the 2003 and 2008 Distribution Agreements bar the Jackel Defendants from using in any fashion, copying, or colorably imitating **LNC's designs** without LNC's written permission and require the Jackel Defendants to pay LNC a royalty if they do so." [Doc. No. 246 at 17] (emphasis added).  The Distribution Agreements do not merely refer to LNC's "designs" but also refer to "*product* designs."  Moreover, the parties' briefing indicates that this is a disputed genuine issue of material fact. *See, e.g.*, Doc. No. 246 at 14-17; Doc. No. 260 at 10-

13; Doc. No. 261 at 7-8; Doc. No. 212-1 at 12-18; Doc. No.  227 at 65-69; Doc. No. 255 at 29-33.  Accordingly, LNC's motion for this point is DENIED.

Mayborn contends that LNC's fifth request compounds the mistakes underpinning its previous requests by making a series of illogical leaps that take it further and further away from the *LNC I* judgment. [Doc. No. 260 at 13].  Specifically, LNC argues that the *LNC I* Jury necessarily concluded that LNC's designs for soft spout cups, flip-it cups, and center straw cups were contractually protected designs, because the Jury Verdict and Final Judgment found a breach of the Distribution Agreements with respect to Jackel's "soft spout cups," "flip-top cups," and "straw cup." [Doc. No. 246 at 19].  LNC then recites a list of individual features that are allegedly included in its cups and therefore individually protected. *Id.* at 19-20.  Mayborn argues that the record shows that LNC did not accuse individual features at trial, so the *LNC I* verdict cannot be said to protect individual features. [Doc. No. 260 at 14-15].

In response, LNC makes a circular argument that it is not saying that individual aspects of the overall designs must be protected, but instead is arguing that the overall design is protected and that the protected design necessarily includes each aspect of the overall design that was pointed out to the jury at the *LNC I* trial. [Doc. No. 261 at 8].  To the extent that LNC is asking the Court to certify its feature-based theory, the Court rejects that argument and reiterates that collateral estoppel and res judicata bars both parties from making certain arguments.

LNC further argues that "[t]he jury found breaches notwithstanding the absence of a compression valve in the spout/straw in the *LNC I* Litigated Products based on the overall design of each top and the various important aspects of the design that were found in the LNC designs." *Id.* at 8-9.  According to LNC, the jury necessarily agreed with the theory and arguments of LNC's counsel that "it's not just about the compression valve." *Id.* at 9.

Mayborn responds that LNC is wrong, and that the Litigated Products all contained a compression valve in the spout or straw. [Doc. No. 264 at 3].  The Court agrees with Mayborn. As discussed in detail above, the record from *LNC I* indicates that "[a] lengthy trial was held in 2013 involving specific Mayborn products alleged to each contain a silicone compression valve similar to LNC's valves." *See* Doc. No. 56-6 at 3. Accordingly, LNC's motion for this point is DENIED.

LNC next argues that it is entitled to partial summary judgment by showing that the aspects of the *LNC I* Litigated Products that LNC alleged in *LNC I* were the basis for the breach (*i.e.*, a soft silicone offset spout/centered straw with an integrated silicone air vent valve) are also found in the Accused Products. [Doc. No. 246 at 22].  LNC further argues that the Accused Products are nothing more than colorable variations of the *LNC I* Litigated Products. *Id.* at 23-32.

Mayborn responds that this is contradicted by the *LNC I* final judgment, which it contends was intentionally limited to specific products. [Doc. No. 260 at 16].  Mayborn argues that in its Reasons for Judgment, the *LNC I* court described why it limited the judgment to "Jackel's (1) soft spout cups; (2) flip-top cup; and (3) straw cup . . . (the 'Litigated Products')." *Id.* (citing Doc. No. 47-4).  Mayborn contends that the court explained how LNC "suggested extending the Judgment to all cups, regardless of their color combination, size, packaging, names and/or brands," and "[i]n denying this request, the Court believes that such language would extend the Judgment beyond the jury's verdict, which involved specific 'Litigated Products.'" *Id.* (citing Doc. No. 47-4. at 5).  According to Mayborn, LNC repeats that request here and asks the Court to do what the *LNC I* court would not. [Doc. No. 260 at 16].

Mayborn further contends that LNC's position also contradicts the *LNC I* permanent

injunction. *Id.*  Mayborn argues that LNC initially tried to extend the injunction to "any products that are copies and/or colorable imitations of Luv n' Care, Ltd.'s: (1) soft spout cups; (2) flip-top cups with a valve and a straw; or (3) straw cups with a valve in the straw." (Doc. No. 260 at 16).  Mayborn argues that LNC "narrowed the scope of the proposed injunction . . . in order to ensure that the requested relief does not go beyond Defendants' scope of liability as decided by the Jury." *Id.* at 21 (citing Doc. No. 47-10 at 19, n.16).  Mayborn also contends that the court agreed and issued an injunction prohibiting "copies and/or colorable imitations of Plaintiff's silicone compression valve: (1) soft spout cups; (2) flip-top cups; or (3) straw cups." *Id.* (citing Doc. No.  47-4 at 9).  Mayborn further argues that the injunction did not include cups with just the silicone top and the dome vent, as LNC now alleges. *Id.*  The Court agrees with Mayborn. Accordingly, LNC's motion for this point is DENIED.

## III.    CONCLUSION

For the foregoing reasons, Mayborn's "Motion for Summary Judgment that LNC's Claims are Barred by the Doctrines of Res Judicata, Waiver, and Equitable Estoppel" [Doc. No. 211]; Mayborn's "Motion for Summary Judgment Concerning Issues of Contractual Interpretation" [Doc. No. 212]; Mayborn's "Motion for Partial Summary Judgment that Certain Features are not 'Proprietary' to LNC" [Doc. No. 213]; and Mayborn's "Motion for Summary Judgment that Pre-2003 Mayborn Product Features Cannot be the Basis of Breach" [Doc. No. 214] are DENIED AS MOOT.

Mayborn's "Motion for Summary Judgment, that the Surviving Provisions are Null and Void Under Lousiana's Noncompetition Statute" [Doc. No. 229] is DENIED.

LNC's "Cross Motion for Partial Summary Judgment Based on Offensive Collateral Estoppel" [Doc. No. 242] is GRANTED IN PART and DENIED IN PART.

MONROE, LOUISIANA, this 29th day of September 2022.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE