## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

LUV N' CARE, LTD.                                     CIVIL ACTION NO. 3:18-CV-00534

VERSUS                                                JUDGE TERRY A. DOUGHTY

JACKEL INTERNATIONL LTD.,                             MAG. JUDGE PEREZ-MONTES
N/K/A MAYBORN (UK) LTD., et al.

### RULING

Pending before the Court is Defendant Mayborn Group Limited, Jackel International Limited, Mayborn (UK) Ltd., Mayborn USA, Inc., Jackel China, Ltd., Mayborn Anz Pty, Ltd., and Product Marketing Mayborn, Ltd.'s (collectively "Mayborn") "Motion for Summary Judgment that LNC's Claims are Barred by the Doctrines of Res Judicata, Waiver, and Equitable Estoppel" [Doc. No. 211].[1]  Plaintiff Luv n' care, Ltd.'s ("LNC") responded to the motion. [Doc. No. 227].  Mayborn filed a reply. [Doc. No. 255].  For the following reasons, the motion is DENIED.

Also pending before the Court is Mayborn's "Motion for Summary Judgment Concerning Issues of Contractual Interpretation" [Doc. No. 212].  LNC responded to the motion. [Doc. No. 227].  Mayborn filed a reply. [Doc. No. 255].  For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

Also pending before the Court is Mayborn's "Motion for Partial Summary Judgment that Certain Features are not 'Proprietary' to LNC" [Doc. No. 213].  LNC responded to the motion. [Doc. No. 227].  Mayborn filed a reply. [Doc. No. 255].  For the following reasons, the motion is DENIED.

---

[1] Citations to the parties' filings are to the filing's number in the docket [Doc. No.] and pin cites are to the page numbers assigned through ECF.

Also pending before the Court is Mayborn's "Motion for Summary Judgment that Pre-2003 Mayborn Product Features Cannot be the Basis of Breach" [Doc. No. 214]. LNC responded to the motion. [Doc. No. 227]. Mayborn filed a reply. [Doc. No. 255]. For the following reasons, the motion is DENIED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

LNC is a Louisiana corporation with its place of business in Monroe, Louisiana. LNC designs, manufactures, and sells baby products under the "Nuby" brand name. Mayborn is also in the business of designing, manufacturing, marketing, and selling baby products. Mayborn sells its own products under the brand name Tommee Tippee.

In 2003 and 2008, Mayborn and LNC entered into two agreements ("Distribution Agreements" or "Agreements") whereby the parties would utilize common distribution channels to get LNC products into the United Kingdom, Ireland, and Gibraltar.[2] At some point in or around 2010, the relationship between the two parties deteriorated, which spawned into the following litigation.

### A.  The Previous Litigation

In May 24, 2010, LNC brought suit against Mayborn in state court alleging breach of the Distribution Agreements by selling certain soft-spout, flip-top, and straw cups with a silicone compression valve ("*LNC I*").[3] Mayborn denied copying or using LNC's product designs, and filed reconventional demands seeking a declaratory judgment that the 2003 and 2008 Agreements were unenforceable. [Doc. No.134-3 at ¶130]. *LNC I* went to trial, and the jury found in favor of LNC and against Mayborn on LNC's claims of breach of the Distribution Agreements and the

---

[2] The "2003 Agreement" can be found at Doc. No. 63-1 at 1-37 or Doc. No. 1-5 at 1-37, and the "2008 Agreement" can be found at Doc. No. 63-1 at 38-117 or Doc. No. 1-6 at 1-79.

[3] "*LNC I*" refers to *Luv n' care, Ltd. v. Jackel International Limited*, Civil Action No. 2010-1891, 4th Judicial District for the Parish of Ouachita, State of Louisiana.

Louisiana Unfair Trade Practices Act ("LUTPA").

A judgment was entered on May 22, 2013, which provided that Mayborn breached the Distribution Agreements "with respect to Jackel's (1) soft spout cups; (2) flip-top cup; and (3) straw cup." [Doc. No. 63-2 at 1]. More specifically, the "Litigated Products" were identified in Exhibit A to the Judgment: (1) First Cup; (2) Kids on the Go Active Cup; (3) Tip It Up Cup; (4) Tip It Up Trainer Cup; (5) Tip It Up Beaker Cup; (6) Tip It Up Sportster Cup; and (7) Tip It Up Flip Top Cup.



*Id.* at 3. The jury also found (and the court concluded) that (1) Defendant Jackel and its affiliates are a single business entity bound by the terms of both distribution agreements; (2) both distribution agreements are valid and not void as against public policy; and (3) Defendant Jackel and its affiliates violated the LUTPA. [Doc. No. 63-1 at 118-122; Doc. No. 63-2 at 1-3].

Following the jury verdict, the state court entered a permanent injunction enjoining Mayborn from selling any of the Litigated Products "as well as any further versions thereof" or other non-litigated products not in existence at the commencement of the January 2013 trial that are copies and/or colorable imitations of "Plaintiff's silicone compression valve: (1) soft spout cups; (2) flip-top cups; or (3) straw cups." [Doc. No. 63-2 at 4]. On May 3, 2013, before the

entry of final judgement in *LNC I,* LNC filed a second state court action ("*LNC II*") in the 4th Judicial District Court for the Parish of Ouachita, alleging that Mayborn's sales of "additional products" also breached the same agreements and violated LUTPA. [Doc. No. 28-6]. Mayborn removed that lawsuit to federal court. LNC voluntarily dismissed *LNC II* on August 27, 2013.

Although all parties appealed the judgment in *LNC I,* the appeal was settled and dismissed on November 21, 2013. On August 14, 2014, LNC filed a third action ("*LNC III*") in the Eastern District of Texas against Mayborn. In that lawsuit, LNC focused on the "additional products" from *LNC II* and added patent infringement claims and LUTPA claims. The district court dismissed LNC's breach of the distribution agreements and the LUTPA claims as barred by res judicata. The patent case settled, and the res judicata decision was never appealed. A final judgement in *LNC III* issued on December 18, 2015, and *LNC II* and *LNC III* were dismissed with prejudice. In October 2015, LNC filed *LNC IV* in the 4th Judicial District Court for the Parish of Ouachita, alleging breach of contract and LUTPA claims as to Mayborn's "Non-Spill" Insulated Straw Tumbler. *LNC IV* was dismissed without prejudice, after the parties executed a settlement agreement dated December 18, 2015.

On March 23, 2018, LNC filed suit against Mayborn in the Fourth Judicial District Court, Ouachita Parish, Louisiana, and the case was removed to this Court shortly thereafter. The "Accused Products" at issue in this case are: (1) the Insulated Straw Tumbler; (2) the Trainer Straw Cup; (3) the Straw Tumbler; and (4) the Transition Cup. [Doc. No. 78 at ¶ 38]. These four Accused Products were not at issue in *LNC I.* LNC contends that in marketing and selling the four Accused Products, Mayborn has "willfully and intentionally breached one or both distribution agreements by improperly using LNC's products, product designs, and non-confidential proprietary information to market and sell competing products without LNC's

consent and without paying the royalty Jackel expressly agreed it would pay." [Doc. No. 210-1 at 5].

In response to the Complaint, Mayborn moved for sanctions and, upon the filing of LNC's proposed Amended Complaint, sought sanctions in a second motion. [Doc. Nos. 28, 47]. On December 5, 2018, the Court held an evidentiary hearing on Mayborn's sanctions motions. The hearing focused on the Distribution Agreements, the State Court Action Judgment and Permanent Injunction, the First Settlement Agreement which was limited to the seven Litigated Products, the four Accused Products, and various product designs contained in LNC's Nuby and *Natural Touch* branded products. On March 14, 2019, the Court denied both sanctions motions and granted LNC's leave to amend the Complaint. [Doc. Nos. 76, 77]. LNC filed an Amended Complaint on that same day. [Doc. No. 78]. A state court case is also pending, but is stayed pending the resolution of this case. [Doc. No. 198-1 at 8 (Hearing Tr. *Luv N' Care v. Jackel International Ltd.*, No. 19-2306, April 14, 2021 (4th JDC, Ouachita Parish))].

On February 8, 2021, Mayborn filed its Answer and Counterclaim to LNC's Amended Complaint. [Doc. No. 168]. Mayborn's Counterclaim contains five counts. Counts I and II seek declaratory judgments that LNC's claims are barred by the doctrines of collateral estoppel, res judicata, acquiescence, and waiver. *Id.* at ¶¶ 105–14. Count III pleads unfair competition in violation of LUTPA by LNC's predatory litigation. *Id.* at ¶¶ 115–22. Count IV pleads breach of contract because "[t]o the extent LNC's allegations of breach of contract against Mayborn are valid, the 2003 and 2008 distribution agreements must then also prohibit LNC from using in any fashion Mayborn's products or product designs and the agreements then impose continuing obligations not to do so on the part of LNC." *Id.* at ¶¶ 123–34. Count V pleads unfair competition in violation of LUTPA by LNC's conduct surrounding its breach of contract. *Id.* at ¶¶ 135–49.

On May 24, 2021, the parties held a status conference and agreed to have an "early dispositive motion" period. [Doc. No. 197]. On November 2, 2021, the Court denied LNC's Motion for Leave to File Second Supplemental and Amending Complaint [Doc. No. 102], which started the early dispositive motion period. Mayborn filed five summary judgment motions [Doc. Nos. 211–214, 229], and LNC filed two summary judgment motions [Doc. Nos. 210, 242].

### B.  Procedural History Regarding the Summary Judgment Motions.

On September 29, 2022, the Court ruled on the summary judgment motions. [Doc. Nos. 270, 271]. The Court granted-in-part and denied-in-part LNC's "Cross Motion for Partial Summary Judgment Based on Offensive Collateral Estoppel" [Doc. No. 242], and denied Mayborn's "Motion for Summary Judgment, that the Surviving Provisions are Null and Void Under Louisiana's Noncompetition Statute" [Doc. No. 229]. [Doc. No. 271 at 1]. The Court further denied as moot Mayborn's "Motion for Summary Judgment that LNC's Claims are Barred by the Doctrines of Res Judicata, Waiver, and Equitable Estoppel" [Doc. No. 211]; Mayborn's "Motion for Summary Judgment Concerning Issues of Contractual Interpretation" [Doc. No. 212]; Mayborn's "Motion for Partial Summary Judgment that Certain Features are not 'Proprietary' to LNC" [Doc. No. 213]; and Mayborn's "Motion for Summary Judgment that Pre-2003 Mayborn Product Features Cannot be the Basis of Breach" [Doc. No. 214]. *Id.*

On October 12, 2022, LNC moved the Court "to reconsider and modify or clarify three aspects of its recent rulings found in Doc. Nos. 268 and 270." [Doc. No. 273 at 1]. The Court granted in part and denied in part LNC's motion. [Doc. No. 281]. Specifically, the Court vacated its ruling that LNC is barred under the doctrine of issue preclusion from relitigating whether an accused product that does not include LNC's silicone compression valve breaches the Distribution Agreements. *Id.* at 2-3. The Court directed the parties to submit briefing on the sole issue of defensive collateral estoppel as identified in the Court's vacated ruling. *Id.* at 3. The

parties submitted additional briefing. [Doc. Nos. 283, 285, 288]. The Court considered the parties' arguments and maintained its order vacating its defensive collateral estoppel ruling. [Doc. No. 289]. The Court found that Mayborn did not cite to any state court findings that would support its contention of how and the extent to which LNC's rights under the Distribution Agreements were determined in *LNC I*. [Doc. No. 289 at 4-5]. The Court further found that Mayborn's argument in the *LNC I* post-trial briefing confirmed that it understood that there was no all-encompassing pronouncement of LNC's rights under the Distribution Agreements in *LNC I. Id.* at 5. Finally, the Court found that as a matter of equity, defensive collateral estoppel should not bar LNC's right to bring claims for new breaches of the Distribution Agreements based upon newly marketed products that were not in existence during *LNC I. Id.* at 6.

On April 3, 2024, the Court reopened Mayborn's First Motion for Summary Judgment, Res Judicata, Waiver, and Equitable Estoppel [Doc. No. 211]; Mayborn's Second Motion for Summary Judgment, Contractual Interpretation [Doc. No 212]; Mayborn's Third Motion for Partial Summary Judgment, Certain Features Are Not "Proprietary" to LNC [Doc. No. 213]; and Mayborn's Fourth Motion for Partial Summary Judgment, Pre-2003 Mayborn Product Features [Doc. No. 214]. On August 19, 2024, the parties jointly moved to continue the existing case deadlines and enter a new scheduling order 30 days after the Court rules upon Mayborn's pending motions. [Doc. No. 293]. The Court granted the parties' motion on August 20, 2024. [Doc. No. 294].

## II.    LAW AND ANALYSIS

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists if a reasonable jury could enter a verdict

for the non-moving party. *Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 811 (5th Cir. 2019) (citation omitted). And "[a] fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In opposing a motion for summary judgment, the adverse party must "designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted). "This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (cleaned up). In determining whether the movant is entitled to summary judgment, the Court "view[s] facts in the light most favorable to the non-movant and draw[s] all reasonable inferences in her favor." *Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 533 (5th Cir. 1997). In sum, summary judgment is appropriate if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## B. Mayborn's Preliminary Statement Regarding Its Motions for Summary Judgment [Doc. Nos. 211, 212, 213, 214]

Mayborn included a preliminary statement in its four motions for summary judgment [Doc. Nos. 211-214] stating that the First Motion "seeks summary judgment that LNC is barred from asserting its feature-based theory of breach under one or more of the doctrines of res judicata, waiver, and equitable estoppel." *See, e.g.*, Doc. No. 211-1 at 6. Mayborn contends that if the First Motion is decided in its favor, then no other motions need to be addressed because it

is case dispositive and requires no rulings on contractual interpretation. *Id.*

Mayborn further contends that the Second Motion addresses discrete and narrow legal issues of contractual interpretation, including whether the surviving provisions of the allegedly breached Agreements permit the product-feature based claims LNC has alleged in this case. *Id.* According to Mayborn, if the surviving provisions do not support a feature-based theory of breach, this case is over entirely, and no other motions need to be addressed. *Id.*

Mayborn further contends that the Third Motion and the Fourth Motion address certain implications that become relevant if the Court construes the Agreements and wider legal position between the parties as permitting the feature-based claims that LNC has alleged. *Id.* Mayborn argues that these motions only need to be addressed in the event that the First Motion is denied and the Court finds that the surviving provisions of the allegedly breached Agreements permit the product-feature based claims LNC has alleged in this case. *Id.*

### C. Mayborn's First Motion for Summary Judgment: Res Judicata, Waiver, and Equitable Estoppel [Doc. No. 211]

Mayborn argues that the accused products from *LNC I* demonstrate that the Amended Complaint alleges breach based on features that existed in the Mayborn products at issue in *LNC I*. [Doc. No. 211-1 at 10-17]. Mayborn contends that this overlap resolves the case because three independent doctrines—res judicata, waiver, and equitable estoppel—all act to bar LNC from saying now what it could have said then. *Id.* at 10. According to Mayborn, every element of res judicata is satisfied because the feature-based causes of action that LNC is alleging in this case could have been brought in *LNC I. Id.* at 17.

The Louisiana Supreme Court has held that a second action is precluded when each of the following elements is satisfied: (1) the first judgment is valid; (2) the first judgment is final; (3) the parties are the same; (4) the causes of action asserted in the second suit existed at the

time of final judgment in the first suit; and (5) the causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation. *Burguieres v. Pollingue*, 2002-1385 (La. 2/25/03), 843 So. 2d 1049, 1053; La. Stat. Ann. § 13:4231.

Here, the Court finds that the fourth element of res judicata is not satisfied (*i.e.*, the cause of action asserted in the second suit existed at the time of final judgment in the first suit). Mayborn does not dispute that it did not market and sell the four Accused Products at issue in this lawsuit until after final judgment in *LNC I*. [Doc. No. 288 at 4] ("[Mayborn] does not challenge LNC's assertion that Jackel did not market and sell the Four Breaching Products at issue in this lawsuit until after final judgment in *Jackel I*.")[4]. Thus, the fourth element of res judicata is not satisfied, because LNC's causes of action did not exist at the time final judgment was entered in *LNC I*.

This is not like *LNC III*, where the court found "that LNC actually enforced the exact same claim in another case and then dropped that claim from the case." *Luv N' Care, Ltd. v. Jackel Int'l, Ltd.*, No. 2:14-cv-855, 2015 U.S. Dist. LEXIS 104143, at *10 (E.D. Tex. Aug. 8, 2015). LNC could not enforce the exact same claim in *LNC I*, because the four Accused Products did not exist until after the final judgment in *LNC I*. Accordingly, the Court find res judicata does not apply in this case.

Mayborn next argues that LNC could have and should have complained about the accused features during the earlier case but chose not to. [Doc. No. 211-1 at 19]. Mayborn contends that LNC won its case by jury verdict using a whole product theory of breach of contract, and cannot walk back from that now. *Id.* at 20. According to Mayborn, the Louisiana

---

[4] *Jackel I* and *LNC I* refer to the same case.

contractual doctrine of waiver provides another basis for summary judgment. *Id.*

Louisiana courts have explained that "[w]aiver is generally understood to be the intentional relinquishment of a known right, power, or privilege." *Arceneaux v. Amstar Corp.*, 66 So. 3d 438, 450 (La. 2011) (citation and internal marks omitted).  As discussed above, there is no dispute that the four Accused Products were not sold until after final judgment was entered in *LNC I*.  Given this undisputed fact, LNC could not intentionally relinquish a right that did not exist.  Moreover, LNC's actions of bringing suit once it became aware of the Accused Products is actually conduct consistent with the intent to enforce the right. *Id.* at 450–51 ("Waiver occurs when there is an existing right, a knowledge of its existence and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished.").  Accordingly, Mayborn failed to show how LNC's conduct can be construed as a waiver of this right.

Finally, Mayborn asks the Court to use its equitable authority to analyze the facts of the case and determine that equity demands dismissal. [Doc. No. 211-1 at 22].  Mayborn argues that LNC made a "representation by conduct" that anything less than copying "all the features" in a specific LNC product were not breaches. *Id.* at 23.  Mayborn further argues that it justifiably relied on LNC's allegations and assertions in *LNC I* to forego a feature-based theory. *Id.*  Finally, Mayborn contends that it "honestly and reasonably believed that LNC would stand by its statements at trial and never allege that using one or just a few individual product features could be a breach of the distribution Agreements." *Id.*

The Court first notes that equitable estoppel is "rarely applied," and the "party invoking the doctrine must exercise such diligence as would reasonably be expected under the prevailing circumstances to avoid mistake or misunderstanding." *L.T. v. Chandler,* 40417 ( La. App. 2 Cir

12/14/05), 917 So. 2d 753, 758 (citing *Case v. Louisiana Med. Mut. Ins. Co*, 624 So. 2d 1290

(La. App. 3d Cir. 1993)). The 5th Circuit has explained the law of equitable estoppel as follows:

> The Louisiana Supreme Court has defined equitable estoppel as the effect of the voluntary conduct of a party whereby he is precluded from asserting rights against another who has justifiably relied upon such conduct and changed his position so that he will suffer injury if the former is allowed to repudiate the conduct. The doctrine, in proper circumstances, will prevent a party from taking a position contrary to his prior acts, admissions, representations, or silence. Equitable estoppel thus has three elements: (1) A representation by conduct or work; (2) Justifiable reliance thereon; and (3) A change of position to one's detriment because of the reliance.

*Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 389 (5th Cir. 2001) (cleaned up).

Mayborn's equitable estoppel defense has the same problems as its res judicata and waiver

defenses. Mainly, Mayborn incorrectly contends that LNC expressly abandoned a "feature-

based" theory in *LNC I*. [Doc. No. 211-1 at 23]. To be clear, LNC identified seven products and

specific features of those products that it contended breached the parties' Agreement in *LNC I*.

Similarly, LNC has identified four Accused Products and specific features of those products that

it contends breach the Agreements in this case. [Doc. No. 78 at ¶ 38]. Thus, Mayborn has failed

to show that LNC is taking a position that is contrary to its prior acts, admissions, or

representations in *LNC I*. As discussed above, these four Accused Products did not exist at the

time of *LNC I*, and bringing the present case is consistent with, not contrary to, LNC's prior

acts, admissions, representations in *LNC I*.

Moreover, Mayborn has failed to show that it justifiably relied on LNC's purported

abandonment of a feature-based theory. Indeed, Mayborn argued the exact opposite of this

understanding in *LNC I* when it contended that "[t]he Jury may have found that Defendants

literally copied LNC's product designs, a single feature of LNC's designs, or that Defendants

made a 'colorable imitation' of LNC's products." [Doc. No. 134-8 at 43]. Accordingly, the

elements of equitable estoppel are not present here, and this case is not the "rare" circumstance where it would be appropriate.

In summary, Mayborn's res judicata, waiver, and equitable estoppel arguments are based on its contention that LNC abandoned a "feature-based theory" in *LNC I*. The Court agrees with Mayborn that LNC argued to the jury in *LNC I* that Mayborn failed to show all the features in one cup. However, that does not mean that LNC abandoned a "feature-based theory." Indeed, LNC explicitly argued to the jury that the seven products had specific features. *See, e.g.*, Doc. No. 211-3 at 1280:3-6 ("The only cups that you have seen in this trial that have all of these features, all of them, are this one and this one no other one has it. The only straw cup that you've seen that had a valve in the straw and have a soft top cup and a soft straw are these two."); *id.* at 1279:15-18 ("But as I predicted to you in my opening Jackel did not present any evidence that a silicone top cup with an offset spout, with a valve inside the spout was known in the industry."). Likewise, the court in *LNC I* entered the injunction by finding that the products included the specific feature of LNC's silicone compression valve. [Doc. No. 47-4 at 9] ("The court's injunction prohibited "copies and/or colorable imitations of *Plaintiff's silicone compression valve:* (1) soft spout cups; (2) flip-top cups; or (3) straw cups.") (emphasis added).

When the *LNC I* court had to revisit the permanent injunction four years later it explained the importance of the silicone compression valve to the *LNC I* verdict. In denying LNC's request to hold Mayborn in contempt, the court explained that:

> A lengthy trial was held in 2013 involving *specific Mayborn products alleged to each contain a silicone compression valve similar to LNC's valves,* with the jury finding Mayborn's products breached distribution agreements between the parties. . . . *Those products contained silicone compression valves* similar to LNC's valves and resulted in an injunction prohibiting Mayborn's use of any of those litigated products as well as any colorable imitations of LNC's valve.

Page 13 of 28

[Doc. No. 56-6 at 3-5] (emphasis added). Accordingly, Mayborn has failed to show that LNC's feature-based causes of action are barred by res judicata, waiver, or equitable estoppel, or that they should bar LNC's breach of contract and LUTPA claims.

That said, the Court agrees with Mayborn that LNC is precluded from arguing "disembodied" features in the abstract. Specifically, LNC must tie LNC's product features to the four Accused Products identified in the Amended Complaint. [Doc. No. 78 at ¶ 38]. Otherwise, LNC could circumvent the Court's order that precluded it from further amending its complaint. As stated in the Court's order, each of Mayborn's products is a new cause of action with its own discrete set of facts. [Doc. No. 102 at 10]. Thus, allowing LNC to argue disembodied features in the abstract (*i.e.*, any alleged "LNC Product Design") that are not tied to one of the four Accused Products would provide no meaningful limits on LNC's Amended Complaint. This would be untimely, unfair, and unduly prejudicial to Mayborn.

As the Court previously stated, "LNC has filed numerous actions of this type against Jackel since 2010 …[and] has had many opportunities to make these allegations against Jackel." [Doc No. 102 at 8 n.12]. In other words, LNC is limited to the LNC product features it alleges are embodied in the four Accused Products as identified in the Amended Complaint. [Doc. No. 78 at ¶¶ 44-47]. Whether each of the four Accused Products is required to include all of the embodied features identified in the Amended Complaint is a question for the trier of fact.

### D. Mayborn's Second Motion for Summary Judgment: Contractual Interpretation [Doc. No. 212]

In their second motion, Mayborn asks the Court to interpret the Agreements at issue. Specifically, Mayborn requests the Court to render the following declarations construing the contracts at issue:

1. The only surviving provision of the 2003 Agreement is Paragraph

21;

2. The only surviving provision of the 2008 Agreement is Paragraph
19;

3. Paragraph 21 of the 2003 Agreement and Paragraph 19 of the
2008 Agreement apply to "whole product designs and not to
individual product features";

4. Paragraph 21 of the 2003 Agreement and Paragraph 19 of the
2008 Agreement "only protect things that are 'proprietary'";

5. The word "proprietary," as used in the Agreements means "owns
or has exclusive right to."

[Doc. No. 212-1 at 7]. Regarding Declaration No. 5, the parties agree that "proprietary" means

"that one owns or has exclusive rights to the product designs." [Doc. Nos. 227 at 70; 255 at 28].

This definition comes from the jury instructions in *LNC I,* which stated that "[p]roprietary means

that one owns or has exclusive rights to the product designs." [Doc. No. 134-6 at 10]. Given the

parties' agreement, the Court grants Mayborn's requested Declaration No. 5, and declares that

"proprietary" means "that one owns or has exclusive rights to the product designs."

Regarding Declaration Nos. 1 and 2, LNC argues that Mayborn is seeking summary

judgment that Paragraph 21 of the 2003 Agreement and Paragraph 19 of the 2008 Agreement

are the *only* two paragraphs that can be breached such that the Court and/or the jury will consider

only those two provisions in isolation. [Doc. No. 227 at 62]. Mayborn responds that it "is not

asking for the Agreements to be carved up with these surviving provisions plucked from the

body of the Agreements and used in isolation [because] [t]hat would be ridiculous." [Doc. No.

255 at 27]. Mayborn states that is not what it is seeking at all. According to Mayborn, it is

asking the Court to identify "the surviving provisions that are *relevant* to LNC's allegations of

breach *in this case*." *Id.* at 28 (emphasis in original).

Contrary to Mayborn's assertion in its reply, the declarations it requests explicitly state

Page 15 of 28

that Paragraph 21 of the 2003 Agreement, and Paragraph 19 of the 2008 Agreement are the "only surviving provision." [Doc. No. 212-1 at 7]. On its face, this would be improper because basic principle of contract interpretation requires consideration of the entire contract when considering the meaning of the language in Paragraphs 21 and 19. *See, e.g.*, La. Civ. Code art. 2050. Indeed, Mayborn states that it is not asking for "isolation," and that the Court "should of course consider the entire contract including all the other provisions." [Doc. No. 255 at 27-28]. In light of its arguments, the Court finds Mayborn's Declaration Nos. 1 and 2 are ambiguous at best, and would cause more confusion than being helpful. In short, Mayborn has failed to provide a persuasive reason why one part of the contract should be declared more relevant than other parts of the contract, when it agrees that the Court must consider the entire contract, including all the other provisions. Accordingly, the Court denies Mayborn's requested Declaration Nos. 1 and 2.

Regarding Declaration No. 3, which is Mayborn's request to declare that Paragraph 21 of the 2003 Agreement and Paragraph 29 of the 2008 Agreement apply to "whole product designs and not to individual product features." Mayborn argues that in both provisions, the parties agreed not use certain things "without written consent of the other party" and those things included "Products design" (2003 Agreement) or "product design" (2008 Agreement) and "any other proprietary design" as well as "colorable imitations thereof[.]" [Doc. No. 212-1 at 13]. Specifically, in the 2003 Agreement, Mayborn argues that the word "Product" refers to a list that contains only complete products and refers to no features or aspects of products. *Id.* at 14-15. Mayborn contends that if LNC had wanted to extend the meaning of "Products" to include the disembodied features, it should have negotiated such terms into the contract. *Id.* at 14.

Mayborn further argues that Paragraph 21 of the 2003 Agreement goes on to include

"any other proprietary designs" as an end-of-list catch-all that refers back to the previously recited "Products design." *Id.* at 15. According to Mayborn, Paragraph 21 of the 2003 Agreement clearly and consistently uses "Products design" and its derivative "designs" to refer to the complete design of a specific product, and not to individual features. *Id.* Mayborn also argues that the term "colorable imitation" emphasizes this point. *Id.* at 15-16. Mayborn contends that the term "colorable imitations" simply means products that so resembles another design as to be likely to cause confusion, mistake, or deception. *Id.* at 16.

Regarding the 2008 Agreement, Mayborn contends that Mr. Hakim testified in *LNC I* that Paragraph 19 of the 2008 Agreement was "the same" as Paragraph 21 of the 2003 Agreement. *Id.* at 17 (citing Doc. No. 211-3 at 122:6–12). Mayborn further contends that there are minor differences in the language, but the point Mr. Hakim and LNC were making is that they are the same in substance and meaning. *Id.* at 17. Mayborn argues that these are distribution agreements entered into for the purpose of distributing whole products, not individual features of products, and that is what the provisions are designed to protect. *Id.* at 18.

LNC responds that it does not dispute that the words of the Agreements at issue should be given their plain and ordinary meaning. [Doc. No. 227 at 65]. LNC contends that Mayborn is trying to twist and misconstrue the word "designs" in the key sentence in Paragraph 21 of the 2003 Agreement and Paragraph 19 of the 2008 Agreement to mean "whole product designs and not to individual product features." *Id.*

The Court agrees with Mayborn that Paragraph 21 of the 2003 Agreement and Paragraph 19 of the 2008 Agreement were intended to be the same, notwithstanding the minor difference in the language. The Court further agrees that the word "Products" or "product" means an entire product. This meaning is given in Paragraph 1.1 of the 2003 Agreement:

> LNC hereby appoints Distributor as its exclusive distributor for all accounts for the territory of United Kingdom, Ireland and Gibraltar (hereafter "Territory") for all baby brand products and accessories, such as baby bottles, teethers, coolbites pacifiers, pacifiers, pacifier clips, soothers, tableware, utensils, cups, nipples, bibs, playthings an grooming and other related feeding accessories ("Baby Products") produced and/or marketed by LNC as Nuby Baby Products (including but not limited to those listed in Exhibit 3 *hereafter called the "Products"*).

[Doc. No. 1-5 at 1] (emphasis added).  Indeed, Exhibit 3 is entitled "<u>PRODUCTS</u>" and includes the following introduction to several "classes" of products:

<u>The Products</u>

The Distributor shall have exclusive sales rights for the following products in the territory:

All Nuby products in the following classes:

[Doc. No. 1-5 at 23].  The exhibit goes on to identify by specific product number and name the actual products LNC sold at the time grouped into classes of "Bottles," "Bottle Accessories," "Nipples," "Pacifiers," "Cups," "Plates and Bowls," "Cutlery," "Bibs," "Playthings," and "Teethers."  These are all actual products, which is exactly what the term "Product" means.

However, the Court disagrees that the terms "Products design," "product design," "any other proprietary designs," or "any colorable imitations thereof" are limited to designs of an entire product, and automatically excludes proprietary designs features of a product.  Paragraph 12A of the 2008 Agreement indicates that "Products" were different from their incorporated "designs."  Specifically, in Paragraph 12A of the 2008 Agreement Mayborn agreed not to "utilize, copy, or cause to have copied any of LNC's or Nuby's *Products, designs,* concepts and/or ideas unless said Products are agreed to in writing by LNC." [Doc. No. 1-6 at 7].

There is additional language of the Agreements that does not support Mayborn's argument that "colorable imitation" can only refer to an "entire product."  Paragraph 21 of the

Page 18 of 28

2003 Agreements prohibit Mayborn from using "in any fashion said information or *designs,* or any colorable imitations thereof" – indicating "colorable imitations" of "designs" within as opposed to whole products. [Doc. No. 1-5 at 16]. As discussed above, in Paragraph 1 of both the 2003 Agreement and the 2008 Agreement the parties defined the products for which Mayborn would be the exclusive distributor in Great Britain, Ireland, and Gibraltar as "Products." [Doc. Nos. 1-5 at 1, 1-6 at 1]. If Mayborn's construction of the word "designs" in Paragraphs 21 and 19 of the Agreements were correct (*i.e.*, the agreements only prohibited them from making "colorable imitations" of an entire product), there would have been no reason for the parties to use the word "designs." They would have just used the word "Products."

The Court agrees with LNC that this indicates that a "design" is reasonably construed to mean something less than an entire product (*i.e.*, a product design). Indeed, Mayborn previously argued in *LNC I* that the jury could have based its verdict on a single aspect of an LNC design. [Doc. No. 134-8 at 43]. Mayborn's argument is inconsistent with the position it now taking that the Agreements only protect entire Products as opposed to designs within Products. Accordingly, the Court denies Mayborn's requested Declaration No. 3..

That said, the Court agrees with Mayborn that LNC is precluded from arguing "disembodied" features in this case. For the reasons discussed above, LNC must tie the alleged breaching features to the four Accused Products identified in the Amended Complaint, and is precluded from arguing disembodied features in the abstract. [Doc. No. 78 at ¶¶ 44-47].

Regarding Declaration No. 4, which is Mayborn's request to declare Paragraph 21 of the 2003 Agreement and Paragraph 19 of the 2008 Agreement "only protect things that are 'proprietary'." Mayborn argues that in both provisions, the enumerated list of items are commonly understood to be proprietary. [Doc. No. 212-1 at 19]. Mayborn further argues that

the list concludes with the catch-all "any other proprietary designs or information," which it contends reinforces the idea that the preceding list of enumerated items means proprietary items. *Id.* Mayborn further contends that the Court should construe the surviving breaching provisions as protecting only things that are "proprietary." *Id.* at 20.  Mayborn also argues that the Fifth Circuit's decision in the *Groupo-Rimar* case is not controlling given Mr. Hakim's admissions that he understood the language as only protecting things that were "proprietary" to LNC or things that he "created." *Id.* at 19-21 (citing Doc. No. 211-3 at 178:4–16, 313:1–3, 11:3–5).

LNC responds that nowhere in the Agreements is the word "things" used. [Doc. No. 227 at 69].  LNC further argues that the word "designs" in the "any colorable imitations thereof" sentence in Paragraph 21 of the 2003 Agreement and Paragraph 19 of the 2008 Agreement is not modified by the word "proprietary" as it is elsewhere in the Agreements. *Id.* LNC contends that the designs themselves need not be proprietary if they are contained within the Products made subject to the Agreements. *Id.* at 70.

The Court agrees with LNC.  Similar to the Fifth Circuit's decision *Groupo-Rimar*, Mayborn improperly asks the Court to impose an extra-contractual requirement that LNC's product-related information already be protected by some other legal right in order to receive protection under the contract. *Luv N' Care, Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016)*Groupo-Rimar*"[t]here is nothing that prohibits or prevents a party from contractually agreeing to greater liability than would have been provided by law." *Byrne v. Sealy & Co.,* 99-288 (La. App. 5 Cir 08/31/99), 742 So. 2d 668, 671.  Indeed, "[p]arties to a contract may limit their right to take action they previously had been free to take." *Universal Gym Equip., Inc. v. ERWA Exercise Equip. Ltd.*, 827 F.2d 1542, 1550 (Fed. Cir. 1987).  In Paragraph 15 of the 2008 Agreement, Mayborn expressly acknowledged LNC's rights in not only its "proprietary

designs," but also its "drawings and designs" and "Product configuration."  Paragraph 15, entitled "Intellectual Property Rights, Product Designs and/or Packaging," provides, in part:Distributor further acknowledges that *LNC has the exclusive rights in the Territory to the use of* the Trademarks, trade names and *brand names, including but not limited to, LNC's rights in connection with* advertising materials, copyrighted packaging and/or *other related materials associated with the Products; and that Distributor has no right or interest therein* or in any other trademark, trade name, or brand name of LNC and/or Nuby or its Licensors. …

> B.  *Distributor hereby acknowledges and agrees not to copy or utilize any of LNC's* formulae, trade secrets, *product design*, patents, drawings, business plans, prototypes, packaging, procedures and methods, [and] any other proprietary designs or information without LNC's written permission.

> C.  If in the event, the Distributor is found to have copied any Intellectual Property Rights, Product Designs and/or Packaging as defined in Paragraph 15 A & B above, then the Distributor will be liable to pay to LNC, at a minimum, a commission of twelve (12) percent on all sales of the infringing product(s) as well as any other remedies allowed by law for LNC to recover its losses and lost sales.

[Doc. No. 1-6 at 8].  Paragraph 16 of the 2008 Agreement further states that "*Upon termination of this Agreement, all rights of Distributor to* the Trademarks, trade names, *drawings and designs of LNC, Product configuration*, proprietary designs, proprietary information and brand names *shall immediately cease and terminate* …" *Id.* at 9.

As the court found in *Groupo-Rimar*, "[t]he plain language of Paragraph 15B states that 'Distributor hereby acknowledges and agrees not to copy or utilize any of LNC's . . . product design . . . without LNC's written permission.' On its face, the clause applies to *any* of LNC's product designs, which would include those in the public domain." *Groupo Rimar*, 844 F.3d at 447 (emphasis in original).  The court in *Groupo-Rimar* further examined an almost identical Paragraph 15, and found that it concerns both LNC's "intellectual property rights" and LNC's "product design and packaging." *Id.* at 448-49.  The court determined that Paragraph 15B

extends that same protection to "any of LNC's . . . product design." *Id.* at 450. Specifically, the court rejected "the notion that the term 'proprietary' [in Paragraph 15A] limits the scope of Paragraph 15B to designs that are intellectual property-protected." *Id.* at 451.

Mayborn argues that even if *Groupo Rimar* were controlling on this point, the difference in this case is Mr. Hakim's "admissions" that he understood the language as only protecting things that were "proprietary" to LNC. [Doc. No. 212-1 at 19-20]. The Court disagrees. As stated in *Groupo Rimar,* "[w]hen the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Groupo Rimar*, 844 F.3d at 447 (citing La. Civ. Code art. 2046). Accordingly, the Court denies Mayborn's requested Declaration No. 4.

### E. Mayborn's Third Motion for Partial Summary Judgment: Certain Features Not "Proprietary" to LNC [Doc. No. 213]

In their third motion, Mayborn seeks a declaration that certain of the articulated features are not "proprietary" to LNC as a matter of law even under LNC's construction of the term. [Doc. No. 213-1 at 6]. Specifically, Mayborn moves the Court to grant partial summary judgment that the following alleged product features are not "proprietary" to LNC as a matter of law, because the following features were not originally conceived by LNC.

> (1) a cup with a soft or silicone top
> (2) a cup with a soft or silicone top having a spout
> (3) a cup with a sculptured body
> (5) a gripper cup
> (6) a straw having a valve
> (7) a straw having a valve inside the straw
> (8) a football helmet flip-it cup with a straw having a valve
> (13) a cup with a soft or silicone top having a spout and compression valve

*Id.* Mayborn contends that these are generic features of cups and bottles, known and used throughout the industry and the historical record for decades. *Id.*

LNC responds with a number of arguments, but only one is relevant to this motion. Specifically, LNC argues that Mayborn's third motion is fundamentally flawed because it is based on the faulty premise that Paragraph 18 of the Amended Complaint refers to "generic features of cups and bottles, known and used throughout the industry and the historical record for decades." [Doc. No. 227 at 76-77] (citing Doc. No. 213-1 at 6).  LNC contends that "Paragraph 18 specifically and expressly refers to ***LNC's*** designs that it exclusively shared with Jackel International for purposes of distribution in the Territory, not generic designs used throughout the industry for decades." *Id.* at 77 (emphasis in original).  LNC argues that Paragraph 18 states:

> During the term of the 2003 and 2008 Distribution Agreements, LNC disclosed and **shared** with Jackel many of ***LNC's*** product designs. The ***LNC*** product designs **shared** with Jackel included, but are not limited to the following…

[Doc. No. 227 at 77] (citing Doc. No. 78 at ¶ 18) (emphasis in original).  LNC contends that Paragraph 18 of the Amended Complaint should be understood as follows:

| | |
|---|---|
| (1)    **LNC's shared product designs for** a cup with a soft or silicone top | (13)    **LNC's shared product designs for** a cup with a soft or silicone top having a spout and compression valve |
| (2)    **LNC's shared product designs for** a cup with a soft or silicone top having a spout, | |
| (3)    **LNC's shared product designs for** a cup with a sculptured body, | |
| (5)    **LNC's shared product designs for** a gripper cup, | |
| (6)    **LNC's shared product designs for** a straw having a valve | |
| (7)    **LNC's shared product designs for** a straw having a valve inside the straw, | |
| (8)    **LNC's shared product designs for** a football helmet flip-it cup with a straw having a valve, | |

*Id.*

Mayborn responds that LNC asks everyone to pretend that when it listed the generic

features in Paragraph 18 of the Amended Complaint it was actually "specifically and expressly refer[ring] to LNC's designs that it exclusively shared with Jackel International for purposes of distribution in the Territory, not generic designs used throughout the industry for decades." [Doc. No. 255 at 38] (citing Doc. No. 227 at 77). Mayborn contends that the re-write does not work at all, because these generic features cannot be proprietary to LNC. *Id.* at 39.

The Court finds that LNC's understanding of Paragraph 18 of the Amended Complaint is the correct one. Specifically, the only potential pool of features that are relevant to LNC's claim of breach of the Agreements are LNC's product designs that it shared with Mayborn, not any or all generic features. Accordingly, whether or not prior art discloses generic features is not relevant to the dispute, because LNC agrees that there are "generic features used throughout the industry for decades." [Doc. No. 227 at 77]. Accordingly, the Court denies Mayborn's motion with the understanding that LNC is precluded from arguing "disembodied" features in this case. For the reasons discussed above, LNC must tie the features of LNC's product designs that it shared with Mayborn to the four Accused Products identified in the Amended Complaint. [Doc. No. 78 at ¶¶ 44-47].

### F. Mayborn's Fourth Motion for Partial Summary Judgment: Pre-2003 Mayborn Product Features [Doc. No. 214]

In their fourth motion, Mayborn moves the Court for a declaration that the product features contained in Mayborn products that predate the 2003 and 2008 Agreements cannot be the basis of breach of these Agreements. [Doc. No. 214-1 at 6]. Mayborn argues that it has been in the business of selling infant cups since 1965, which it contends is years before LNC was in existence. *Id.* Mayborn references the following three products that it contends were sold before enter into the Agreements with LNC.



*Id.* Mayborn argues that the bolded features (the "Subject Features") from the list below are present in these Mayborn products.

| | |
|---|---|
| **(1)  a cup with a soft or silicone top,** | (9)  a straw cup with a silicone valve, |
| **(2)  a cup with a soft or silicone top having a spout,** | **(10)  a cup with a top having a silicone insert so part of the top is hard and part is soft,** |
| **(3)  a cup with a sculptured body,** | |
| **(4)  a cup with a silicone top having a spout and recessed one piece valve,** | **(11)  silicone tops having a valve for air replacement,** |
| **(5)  a gripper cup,** | (12)  a straw with an air dimple vent, |
| (6)  a straw having a valve, | (13)  a cup with a soft or silicone top having a spout and compression valve |
| (7)  a straw having a valve inside the straw, | |
| (8)  a football helmet flip-it cup with a straw having a valve, | (14)  the configurations of LNC's products |

*Id.* at 7. Mayborn argues that half of the alleged "LNC Product Designs" can never be the source of a breach claim, because Mayborn's own products used these features before 2003. *Id.*

LNC responds that Mayborn pointed to all four of the PUR and Phase 2 products identified in its fourth motion for summary judgment in support of its same argument in *LNC I,*

when it argued that the Jackel Defendants already had a "silicone spouted cup." [Doc. No. 227 at 96] (citing Doc. No. 227-24 at 26:13-26:23, 361:20-362:1; 917:12-918:7; Doc. Nos. 227-29, 227-30, 227, 227-32. LNC argues that the jury necessarily rejected that argument, and that Mayborn cannot relitigate this issue. [Doc. No. 227 at 93].

LNC also argues that Mayborn raised the same losing argument in *Luv n' care, Ltd. v. Mayborn USA, Inc.,* 898 F. Supp. 2d 634 (S.D.N.Y. 2012). [Doc. No. 227 at 93]. LNC contends that Mayborn is collaterally estopped from challenging that LNC's soft spout product design was original to LNC. *Id.* LNC further contends that the pre-existing product designs that Mayborn identify are wholly dissimilar from the specific *LNC* product designs pled by LNC. *Id.* at 93-94. LNC argues that Mayborn disregards the fact that LNC asserts the *LNC* product designs contained in the existing and to be manufactured Products LNC shared with Mayborn have been impermissibly used, copied and/or colorably imitated in breach of the Agreements. *Id.* at 94.

Mayborn replies that LNC does not contest that the following features from its Amended Complaint were present in Mayborn's historical products and are thus not proprietary to LNC.

(1)   a cup with a soft or silicone top;
(2)   a cup with a soft or silicone top having a spout;
(3)   a cup with a sculptured body;
(4)   a cup with a silicone top having a spout and recessed one piece valve,
(5)   a gripper cup;
(10)  a cup with a top having a silicone insert so part of the top is hard and part is soft; and
(11)  silicone tops having a valve for air replacement.

[Doc. No. 255 at 41]. Mayborn contends that LNC is attempting another rewrite of its allegations to include unpled features. *Id.*

For the reasons discussed above, the Court finds that LNC's understanding of Paragraph

18 of the Amended Complaint is the correct one. Specifically, the only potential pool of features that are relevant to LNC's claim of breach of the Agreements are LNC's product designs that it shared with Mayborn, not any or all generic features. That said, to the extent that Mayborn had relevant designs before the Agreements were executed, those designs are not subject to LNC's breach of contact claims. There is no evidence that the parties intended anything different. In fact, both Agreements indicate that Mayborn is free to continue selling competing products alongside LNC, which would include pre-2003 Mayborn products. Specifically, Paragraph 13 in the 2003 Agreement describes the parties "clear expectations" that "[d]istributor shall be free to sell merchandise manufactured by sources other than LNC, whether or not in competition with Products." [Doc. No. 1-5 at 9]. Likewise, Paragraph 12 of the 2008 Agreement includes a similar "clear expectations" clause. [Doc. No. 1-6 at 7].

As the Court previously stated, each of Mayborn's products is a new cause of action with its own discrete set of facts. [Doc. No. 102 at 10]. Therefore, Mayborn is not precluded from arguing that designs in the four Accused Products were ones Mayborn had before the Agreements were executed. However, to the extent that the designs identified by Mayborn in its motion are relevant to features identified by LNC, the Court finds that there is a genuine dispute as to material facts regarding these features. Accordingly, the Court denies Mayborn's motion with the understanding that LNC is precluded from arguing "disembodied" features in this case. For the reasons discussed above, LNC must tie the features of its product designs that it shared with Mayborn to the four Accused Products identified in the Amended Complaint. [Doc. No. 78 at ¶¶ 44-47].

## III.   CONCLUSION

For the foregoing reasons, Mayborn's "Motion for Summary Judgment that LNC's Claims

are Barred by the Doctrines of Res Judicata, Waiver, and Equitable Estoppel" [Doc. No. 211]; Mayborn's "Motion for Partial Summary Judgment that Certain Features are not 'Proprietary' to LNC" [Doc. No. 213]; and Mayborn's "Motion for Summary Judgment that Pre-2003 Mayborn Product Features Cannot be the Basis of Breach" [Doc. No. 214] are **DENIED**.

Mayborn's "Motion for Summary Judgment Concerning Issues of Contractual Interpretation" [Doc. No. 212] is **GRANTED IN PART** and **DENIED IN PART**.

MONROE, LOUISIANA, this 28th day of May, 2025.

_____
Terry A. Doughty
United States District Judge